1        IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF KANSAS

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                         Plaintiff,) District Court
                                      ) Case No. 12-10219
6    vs.                              )
                                      )
7    DINH NGUYEN,                     )
                                      )
8                         Defendant,)
                                      )
9    _____

10

11

12          **TRANSCRIPT OF SENTENCING HEARING**

13

14       On the 5th day of August, 2014, came on to be heard
     Sentencing in the above-entitled and numbered cause
     before the HONORABLE MONTI L. BELOT, Judge of the United
15   States District Court for the District of Kansas,
     Sitting in Wichita.

16

17

18

19

20   APPEARANCES

21       The Plaintiff appeared by and through Mr. David
     Lind;

22       The Defendant appeared by and through Mr. Lee
23   Thompson and Ms. Erin Thompson.

24

25

1                          **I N D E X**

2     **AUGUST 5, 2014:**

3     **WITNESS**
      **AARON HAMOR**
4     Direct Examination by Mr. Lind:              4
      Cross Examination by Mr. Thompson:         45
5     **DALE McDANIEL**
      Direct Examination by Ms. Thompson:        78
6     Cross Examination by Mr. Lind:            120

7     Certificate of Certified Shorthand Reporter: 135

8     **EXHIBITS        I      O       A**
      **Government**
9        1              8
         2             13
10       4             21
         5             13
11       6             18
         8             18
12      10             10
        11             16
13      12             12
        14             33
14      15             26

15    **Defendant**
         3             88
16       4             94
         5             85
17       6             79
         7            112
18       8             67
         9            118
19      10             61

20

21

22

23

24

25

```
 1                    (Beginning at 10:35 a.m. August

 2                    5, 2014, the following

 3                    proceedings were held.)

 4            THE COURT:  Good morning everyone.  We're

 5   going to have the hearing that we've planned for

 6   sometime now in Mr. Nguyen's case concerning the tax

 7   aspects of sentencing.  David Lind is here for the

 8   Government.  The Defendant appears with Erin and Lee

 9   Thompson.  My thought is to let Mr. Lind put on his

10   witness, you can cross-examine him and then we'll see

11   where we go from there.

12            MR. THOMPSON:  Okay.

13            THE COURT:  All right.

14            MR. LIND:  Your Honor, just preliminarily,

15   I've spoken with Mr. Thompson and I think -- both of us

16   have exhibits.  They've got nine and I've got 16.  I

17   think we are going to stipulate to the admissibility of

18   each other's exhibits.

19            THE COURT:  I wouldn't think there would be

20   too much reason to do anything else in this case.

21            MR. THOMPSON:  No, we would certainly

22   stipulate; and you have complete copies of each one and

23   stipulate for purposes of this sentencing hearing.

24            THE COURT:  Right.  Thank you.

25            MR. LIND:  United States calls Aaron Hamor.
```

1        **AARON HAMOR**

2   Having been first duly sworn to tell the truth, the

3   whole truth and nothing but the truth, testified as

4   follows on:

5               **DIRECT EXAMINATION**

6   BY MR. LIND:

7   Q   Sir, would you tell the Court what you do for a

8   living?

9   A   I am a special agent with IRS Criminal

10  Investigations.

11  Q   And how long have you been with the IRS?

12  A   I have been with the IRS since June of 2001.

13  Q   And you're currently stationed in Wichita?

14  A   Yes, sir.

15  Q   How long have you been in Wichita?

16  A   I've been in Wichita approximately six years now.

17  Q   And are you familiar with an investigation into the

18  Defendant Mr. Nguyen?

19  A   Yes.

20  Q   And were you the agent assigned to this case?

21  A   I was.

22  Q   And did you do the investigation and the tax

23  calculation for -- with this case?

24  A   I did.

25  Q   Agent Hamor, what I'd like you to do is to -- let's

1    just start with how you became involved in the case and

2    how you did your investigation and how you came up with

3    the tax calculation you did.  That's kind of where we

4    want to go.  All right?

5    A    Okay.

6    Q    When did you become involved in this case?

7    A    In approximately 2009, I believe, is when I started

8    this case.  It was referred to me and got assigned and

9    then I started doing the investigation.  What I did

10   during the investigation was several interviews.  One of

11   the people I did interview was Mark Shipley.  I

12   subpoenaed a bunch of bank statements and credit card

13   records.  And I also got the records that were filed

14   with the Secretary of State for the various businesses

15   that were involved.

16   Q    Okay.  And the businesses involved, two of 'em, two

17   of the names that come out here are BN Scooters, Inc,

18   National Direct Power Sports?

19   A    Yes.

20   Q    And then we have the Scooter World?

21   A    Yes.

22   Q    Were you able to get business records from those

23   businesses?

24   A    I did not get any business records from those

25   businesses.  I was told that the records were no longer

1    available, that they had been gotten rid of.

2    Q    Okay.  And where did you get that information from?

3    A    Mark Shipley told me that when I interviewed him.

4    Q    Did you attempt to get records from anyone else?

5    A    He was the only one I tried to get records from.

6    Q    All right.  If you can't get the business records

7    from the actual businesses, how do you go about trying

8    to determine their income and their tax liability?

9    A    By getting the bank statements and any other

10   financial records that we can find; looking at their tax

11   returns and seeing what was reported on there.  Various

12   businesses are required to report information to the

13   IRS.  So if any of that information was reported to the

14   IRS, then I would contact those businesses to see why

15   they provided that information to the IRS and what

16   records they would have to support that information.

17   Q    So you began with interviews.  And you said you

18   interviewed a Mark Shipley.  Tell the Court who Mark

19   Shipley is and why you interviewed him?

20   A    Mark Shipley was involved as a business partner with

21   Dinh Nguyen in the various scooter businesses.

22   Q    And did you -- when you interviewed Mr. Shipley,

23   what type of information were you seeking from him?

24   Just a background on the case or --

25   A    I was trying to find out how the business operated;

1    who was responsible for the bookkeeping, recordkeeping

2    for the business; who was responsible to prepare the tax

3    returns; what type of information they used to prepare

4    the tax returns; who made the decisions for the

5    business; how everything got set up; how the bank

6    accounts were established, the credit card accounts were

7    established, things like that.

8    Q    And did Mr. Shipley provide information on those

9    topics?

10   A    He did.

11   Q    Did you do anything after that to verify what he

12   told you?

13   A    Yes.   I subpoenaed the bank statements from the

14   various banks to see the accounts were set up as he had

15   stated.   I got the records from the Secretary of State

16   to see how the businesses were set up; subpoenaed the

17   credit card records, things like that.

18   Q    Did you also pull the tax returns for Mr. Shipley,

19   Mr. Nguyen and at least National Direct Power Sports?

20   A    Yes, I did.

21   Q    And what year did you begin looking at tax returns?

22   A    I began in 2003 looking at the tax returns and then

23   the investigation focused on 2004, 2005 and 2006 tax

24   years.

25   Q    Obviously, today we're here dealing with the year

1   2006 because that's what -- that's the year of the plea;

2   correct?

3   A    Correct.

4   Q    But in your investigation, you began earlier.  Why

5   did you begin back in 2003 looking at the tax returns

6   for Mr. Nguyen?

7   A    Well, to see if there was a way that they reported

8   the businesses; to find out that if what Mr. Shipley had

9   told me when I interviewed him was correct as far as how

10  the businesses got reported on each individual's tax

11  returns; and just to see if there was any other tax

12  violations that occurred in any of the prior years also.

13  Q    What did Mr. Shipley tell you?  How did he explain

14  how the business was set up and how the tax returns were

15  done?

16  A    Mr. Shipley told me that he was responsible for all

17  of the sales that occurred in the brick and mortar store

18  that was located in Wichita, Kansas, and that Dinh

19  Nguyen was responsible to report all of the internet

20  sales that occurred for the business for the years 2004,

21  2005 and 2006.

22  Q    Let me show you Government Exhibit 1 and ask you if

23  you can identify what that is?

24  A    Yes.  This is the 2003 individual income tax return

25  for Dinh Nguyen.

1    Q    And why -- what's important about that particular

2    tax return?

3    A    This shows that BN Scooters was in operation in 2003

4    and that Dinh Nguyen had reported income and expenses

5    for that business on his individual income tax return.

6    Q    Okay.  And he filed a 1040 with a Schedule C, profit

7    or loss of a sole proprietorship, didn't he?

8    A    Correct.

9    Q    So this tax return looks as though Dinh Nguyen, this

10   is his business, this BN Scooters?

11   A    Correct.

12   Q    And it gives an address for the BN Scooters, doesn't

13   it?

14   A    Yes.

15   Q    And what is that address?

16   A    It's 1215 North Northshore Boulevard, Wichita,

17   Kansas, 67212.

18   Q    Do you know whose address that was at the time?

19   A    That was the address he was staying at.  The house

20   is actually owned by one of his brothers.

21   Q    So in 2003 BN Scooters is an individual

22   proprietorship?

23   A    Correct.

24   Q    Of Mr. Nguyen's?

25   A    Correct.

1    Q    That's how he filed his taxes?

2    A    Correct.

3    Q    Now, in 2004 something happened with the business;

4    correct?

5    A    Correct.

6    Q    It changed the type of business it was?

7    A    At the beginning of 2004, there was incorporation

8    paperwork filed with the Kansas Secretary of State for

9    BN Scooters.  The paperwork listed Dinh Nguyen as the

10   director of the business; and his brother Alec Nguyen,

11   who's an attorney, is the one who incorporated the

12   business in 2004 for him.

13   Q    Let me show you Government Exhibit 10.  What is

14   Government Exhibit 10?

15   A    It is the Articles of Incorporation for BN Scooters,

16   Inc.

17   Q    And it was incorporated here in the State of Kansas?

18   A    Yes.

19   Q    Now, once someone -- does it list who the directors

20   are?

21   A    It lists Dinh Nguyen on the board of directors.

22   Q    With that particular filing, does that change his

23   business from a sole proprietorship?

24   A    Yes.  He should have reported his income in this

25   year on a corporate tax return form 1120.

1    Q    Did he do that?

2    A    No, he did not.

3    Q    All right.  In the filing, did they go ahead and

4    file a yearly report?  A year-end report for that

5    business?

6    A    Yes.  They filed an annual report for the business

7    in the beginning of 2005.

8    Q    And I think that's at the end of the exhibit after

9    the Articles of Incorporation?

10   A    Yes.

11   Q    And does it list -- and it's a for-profit

12   corporation annual report?

13   A    Yes.

14   Q    And it lists who the president is?

15   A    Yes.  The president is Dinh Nguyen.  And it lists

16   the secretary as Mark Shipley.  And the treasurer as

17   Dinh Nguyen.

18   Q    Okay.  Does it also on the next page, when you get

19   into it, does it state the nature of the business?

20   A    Yes.  It says the nature of the business is internet

21   sales.

22   Q    All right.  So BN Scooters Incorporated was

23   incorporated in the State of Kansas to do internet

24   sales?

25   A    Correct.

1    Q    Now, was there also -- you talked about a brick and

2    mortar building.  Was there a brick and mortar building

3    opened up that year?

4    A    Yes.

5    Q    And was a separate bank account opened for that

6    building?

7    A    Yes, it was.

8    Q    That business?

9    A    There was.

10   Q    Let me show you what's been marked as Government

11   Exhibit 12.  Just ask if you recognize that?

12   A    I do.

13   Q    What is that?

14   A    It is the bank account that was opened up at Bank of

15   America for Scooter World Corporation.

16   Q    Okay.  Scooter World Corporation, does it give who

17   the president of Scooter World is?

18   A    President of Scooter World is listed as Mark

19   Shipley.  And Dinh Nguyen is listed as the

20   vice-president.

21   Q    And there's an address given for the Scooter World

22   Corporation, a mailing address on the bank account?

23   A    Yes.

24   Q    Do you know whose address that is, the 7700 East

25   13th Street North, unit 21?

1   A    That is the address of Mark Shipley's mother.

2   Q    So Scooter World Corporation opened in 2004.  BN

3   Scooters Incorporated in 2004?

4   A    Correct.

5   Q    They have different presidents?

6   A    Yes.

7   Q    Different addresses?

8   A    Yes.

9   Q    Scooter World, it doesn't list here what its purpose

10  is.  But BN Scooters says it's for internet sales?

11  A    Correct.

12  Q    Okay.  Now, with those two things in mind, did you

13  look at the 2004 tax returns of both Dinh Nguyen and

14  Mark Shipley?

15  A    I did.

16  Q    Let me show you Exhibits 2 and 5.  Let's go through

17  Exhibit 2.  What is Exhibit 2?

18  A    Exhibit 2 is the 2004 Form 1040 U.S. individual

19  income tax return for Dinh Nguyen.

20  Q    And what is Exhibit 5?

21  A    Exhibit 5 is the 2004 Form 1040 U.S. individual

22  income tax return for Mark Shipley.

23  Q    Now, when you looked at these returns, what did you

24  find?  You can talk about 'em but refer to which number

25  you're looking at.

1   A   On Exhibit 2, the one for Dinh Nguyen, I noticed

2   that he filed the same way in 2004 as he did in 2003,

3   that he reported the profit and loss, all the income and

4   expenses of the BN Scooters on a form Schedule C of his

5   individual income tax return.

6       And then on the 2004 tax return for Mark Shipley,

7   he also included the Schedule C for profit and loss from

8   the business, reporting income and expenses of the

9   scooter business but he reported it for Scooter World.

10  Q   Now, let's stay on Exhibit 5, Mr. Shipley's.  He

11  lists that as Scooter World and he gives an address,

12  doesn't he?

13  A   Yes.

14  Q   And it's 4002 West Central, Wichita?

15  A   Correct.

16  Q   Is that the brick and mortar store you talked about?

17  A   Yes.

18  Q   And he listed the Scooter World as his sole

19  proprietorship on his tax return?

20  A   Correct.

21  Q   With a Schedule C?

22  A   Correct.

23  Q   No corporate tax return was filed?

24  A   No.

25  Q   Mr. Nguyen, on Government Exhibit 2 again, he gave

1    the name of his business as BN Scooters; correct?

2    A    Correct.

3    Q    Which we know from their incorporation was supposed

4    to be an internet sales business?

5    A    Correct.

6    Q    Did he give an address for that business?

7    A    Yes.  It's 1215 North Northshore Boulevard, Wichita,

8    Kansas.

9    Q    Which you said was the home where he was living?

10   A    Correct.

11   Q    So in 2004, Mr. Shipley and Mr. Nguyen filed tax

12   returns for sole proprietorships, two separate ones?

13   A    Correct.

14   Q    What significance was that to you?

15   A    Well, after looking at the subsequent years, too,

16   seeing that they were incorporated in 2004, or the

17   business BN Scooters was incorporated in 2004 and yet it

18   was reported separately on Dinh Nguyen's tax return as

19   his sole proprietorship and Scooter World being reported

20   on Mark Shipley's tax return as a sole proprietorship,

21   that was in line with what Mark Shipley had told me

22   during his interview was that Scooter World was his part

23   of the business, the brick and mortar store that he was

24   responsible for, and that the internet sales were Dinh

25   Nguyen's business and he was responsible for reporting

1    all of that.

2    Q    Now, did things change again at some point during

3    2005 as the nature of the business?

4    A    In 2005, the name of the business changed to

5    National Direct Power Sports.  The business was --

6    National Direct Power Sports was incorporated.  And then

7    there was also an election filed to be treated as an S

8    corporation.

9    Q    Let me show you Government Exhibit 11.  National

10   Direct -- that's the incorporation of National Direct

11   Power Sports?

12   A    Correct.

13   Q    And who was the incorporator for that?

14   A    Alex Nguyen, Dinh's brother.

15   Q    Who was an attorney in Wichita?

16   A    Correct.

17   Q    So they were incorporated.  And does that particular

18   document tell you who the officers were and does it give

19   any indication as to how much stock each one -- each of

20   the shareholders owned?

21   A    This one doesn't say who the officers are; but it

22   lists the bored of directors and it lists Dinh Nguyen

23   and Mark Shipley both on the board of directors.

24   Q    Okay.  Do you know, did anything happen with BN

25   Scooters at the time?

1    A    Not that I'm aware of.

2    Q    So it's still out there somewhere?

3    A    It's still -- yeah, their internet site is still up

4    and it's still operating the same way it has been.

5    Q    After National Direct Power Sports was incorporated,

6    did they add a name to the internet site?

7    A    Eventually that name did get added to the internet

8    site at the bottom below BN Scooters.

9    Q    Other than the adding the name National Direct Power

10   Sports, did the internet side of the business seem to

11   change?

12   A    No.

13   Q    After the National Direct Power Sports was

14   incorporated and became an S corporation, did you look

15   at the taxes to see how they filed in 2005?

16   A    I did.

17   Q    And what did you find?

18   A    I saw that Mark Shipley continued to report the

19   sales for Scooter World on his individual Form 1040 on a

20   Schedule C; and he filed his tax return in February,

21   2006, for the 2005 tax year.  And then the S corporation

22   return for National Direct Power Sports and Dinh

23   Nguyen's individual tax return didn't get filed until

24   October of 2006.  Both signed on the same day.  Dinh

25   only reported 10% of what was put on the tax return for

1    National Direct Power Sports and nothing else on his tax

2    return.

3    Q    Okay.  I'll show you Government Exhibits 6 and 8

4    first.  6 is Shipley's 1040 for 2005?

5    A    Correct.

6    Q    8 is Mr. Nguyen's -- I'm sorry, Mr. Nguyen's is 3?

7    A    Yes.  Dinh Nguyen's 2005 1040.

8    Q    8 is National Direct Power Sports Form 1120 S?

9    A    Correct.

10   Q    So number 8 is the actual return for the business?

11   A    Yes.

12   Q    And you say it was signed on October 6, the same day

13   as Mr. Nguyen's personal return?

14   A    Correct.  October 10th, 2006.

15   Q    October 10.  Now, on the 1120 S, does it state

16   somewhere the percentage of stock owned by each,

17   Mr. Nguyen and Mr. Shipley?

18   A    On the pages in this tax return, it does not.

19   Q    Okay.  Were you made aware of how they were -- how

20   at least they claim to have divided it up?

21   A    Yes.

22   Q    And how was that?

23   A    Supposedly, Mark Shipley owned 90% of the business

24   and Dinh Nguyen was 10% owner of the business.

25   Q    And when you -- do you know where you got that

1    information?

2    A    That information came from Mark Shipley.

3    Q    On Exhibit 3, the 2005 individual return of

4    Mr. Nguyen, does it also list the percentage?

5    A    Yeah.  There's a Schedule K-1 attached to Dinh

6    Nguyen's tax return that says he's the 10% shareholder

7    of National Direct Power Sports.

8    Q    So, again, that verified what Mr. Shipley had told

9    you?

10   A    Correct.

11   Q    So in 2005, it's now an S corporation, Mr. Shipley

12   told you he owns 90% of this corporation, Mr. Nguyen

13   owns 10%?

14   A    Correct.

15   Q    Did you find it odd that Shipley filed his personal

16   taxes in February but the business didn't file until

17   October?

18   A    Yes.

19   Q    Why is that?

20   A    Well, because normally if you have a business and

21   you wait until that business tax return is filed before

22   you file your personal tax return because you have to

23   report the income or loss or whatever from the business

24   on your personal tax return.  And if you file it before,

25   you're not able to do that.

1    Q    For the year 2006 did you also look at the tax

2    returns for that year?

3    A    I did.

4    Q    And what did you find in 2006?

5    A    In 2006, there was an 1120 S filed for National

6    Direct Power Sports and then Mark Shipley filed his

7    individual tax return reporting 90% of the income that

8    was reported on the corporate tax return; and Dinh filed

9    his individual tax return reporting 10% of the income

10   that was reported on the corporate tax return.

11   Q    Did you talk to Mr. Shipley about how he prepared

12   his tax return?

13   A    I did.

14   Q    Did he tell you where he came up with the figures?

15   A    He said he didn't know and kept telling me that I

16   needed to ask Dinh Nguyen where the figures came from

17   and how things were prepared.

18   Q    Did he take responsibility, saying he was to file a

19   return for the entire business, both the brick and

20   mortar store and the internet sales?

21   A    No.  He told me he was only responsible for filing a

22   tax return reporting the income and expenses for Scooter

23   World, which was just the brick and mortar store for the

24   business.

25   Q    So he maintained that position throughout?

1    A    Yes.

2    Q    Now, on the particular -- Mr. Shipley did sign the

3    corporate returns?

4    A    Correct.

5    Q    Both for 2005 and 2006?

6    A    Correct.

7    Q    Let me just kind of run through these and identify

8    them for the record.  Government Exhibit 4 is

9    Mr. Nguyen's 2006 1040?

10   A    Correct.

11   Q    7 is Mr. Shipley's 2006 1040?

12   A    Correct.

13   Q    And 9 is the 1120 S.

14   A    For National Direct Power Sports for 2006; correct?

15   Q    Okay.  So you've gone back.  Were there any other

16   returns you found for -- did you find another return for

17   BN Scooters, ever a corporate return for it?

18   A    No.

19   Q    Did you find other returns dealing with these

20   businesses or these two individuals?

21   A    No.

22   Q    When BN -- when National Direct Power Sports was

23   incorporated, theoretically, a new business starts at

24   that point?

25   A    Correct.

1    Q    And they are then, when they're accepted as an S

2    corporation, they have to file a tax return as an S

3    corporation and -- with the IRS; correct?

4    A    Correct.

5    Q    And they were accepted as an S corporation in

6    October of '05?

7    A    Correct.

8    Q    How should they have filed their tax returns for

9    '05?

10   A    There should have been a tax return filed for the

11   last three months of the year for National Direct Power

12   Sports on an 1120 S; and the tax return for BN Scooters,

13   since it was still incorporated, should have been filed

14   on a Form 1120.  And then Dinh and Mark Shipley should

15   have filed their individual tax returns also.

16   Q    Now, if I can get you to go back to number 10.  I

17   know you have a lot of documents here.  The Articles of

18   Incorporation for BN Scooters.

19   A    Yes.

20   Q    At some point did they go ahead and dissolve that

21   corporation?

22   A    They did.  They filed the dissolution paperwork in

23   February of 2006.

24   Q    Okay.  And that's part of that Exhibit 10?

25   A    Yes.

1    Q    And when they dissolved, did they -- does it tell

2    you who the stockholders are?

3    A    Yes.  It says the stockholders are Dinh Nguyen and

4    Mark Shipley and they both signed as the stockholders.

5    Q    And as stockholders, when a corporation dissolves,

6    what happens with the assets or the liabilities of the

7    corporation?  What's supposed to happen?

8    A    The assets and liabilities of the corporation are

9    supposed to be distributed according to each

10   shareholder's percentage of the stock that they own in

11   the business.

12   Q    Were you ever able to determine what percentage of

13   stock Mr. Shipley and Mr. Nguyen owned in BN Scooters?

14   A    No.

15   Q    But, obviously, since they're two shareholders,

16   there should have been some split?

17   A    Yes.  If it was done correctly.

18   Q    So now you've looked at all the tax returns, you've

19   interviewed Mr. Shipley.  Where are you in your

20   investigation and what did you decide to do next?

21   A    I decided to analyze all the bank records and the

22   statements for the credit cards that I had subpoenaed.

23   And compare the income -- or, the deposits going into

24   the bank accounts to what was reported on the tax

25   returns and then come up with a tax loss according to

 1    those calculations.

 2    Q    And this is a method -- is there a name for that

 3    method?

 4    A    Yes.  I used what's called a bank deposits method to

 5    compute the taxable income.

 6    Q    Okay.  And we'll go through what you did because you

 7    have kind of a worksheet that will help us go through

 8    that; but, again, if you could, what type -- how do you

 9    go about doing it?  When you start in with a bank

10    account, how is it that you look at it and determine

11    whether this is a good expenditure, a good deposit?

12    What do you look at?

13    A    I take all the bank statements that I get and I

14    enter everything into a spread sheet, an Excel spread

15    sheet, listing what is listed on the deposit slips,

16    what's on the checks; and then I sort that information

17    by the year to figure out how much was deposited and how

18    much went out of the bank account.  When I was doing the

19    bank deposit method in this case I looked at the -- on

20    the deposit side, if there was checks, if in the memo

21    section it said it was for Scooter, and if it was, I

22    counted it as income for the business; or if there was

23    no memo written in the memo section of the check, then

24    if it was an amount that was similar to all the other

25    checks that had memos written, I would count that as

income for that also.  On the expense side, I basically

allowed everything, giving the benefit of the doubt to

Dinh that it was a business expense if it came out of

one of the business accounts.  If there was large items

that I could go out and interview somebody about, I

would go out and interview them to find out exactly why

a check or whatever was written for that person and then

make a determination whether or not that's a business

expense or not.  Then I also interviewed Mark Shipley to

ask questions about how the business operated and what

kind of expenses should be expected.

Q   Okay.  Now, in 2006, were there primarily two

different bank accounts used?

A   Yes.

Q   They were both at Bank of America?

A   Correct.

Q   And you subpoenaed both of those accounts; correct?

A   Correct.

Q   And you got more than 2006; but right now we're

dealing with that year and that's what you're going to

talk about here in a moment?

A   Correct.

Q   Okay.  And just, again, for clarity, Exhibits 15 and

16 are the two bank accounts?

A   Correct.

1    Q    And you've got not only the bank statements, but you

2    have actual checks, photocopies of checks and different

3    transactions in the bank?

4    A    Correct.

5    Q    And Government Exhibit 15 is the bank account ending

6    in 5729.

7    A    Correct.

8    Q    16 is the bank account ending in 3836?

9    A    Correct.

10   Q    Those are the two main ones used in 2006?

11   A    In 2006, yes.

12   Q    One thing I wanted to ask.  In 2006, the last six

13   months of that, did you notice quite a bit of activity

14   of withdrawals --

15   A    Yes.

16   Q    -- from the bank?

17   A    Yes.

18   Q    Let me --

19            THE COURT:  Which account?

20            MR. LIND:  And we'll cover that, Your Honor.

21   I'm going to --

22   BY MR. LIND:

23   Q    In 2006, in bank account ending in 5729?

24   A    Correct.

25   Q    And were there a number of withdrawals, cash or

1    large checks coming out of that account?

2    A    Yes, there were.

3    Q    And Government Exhibit 12, it lists those particular

4    transactions?

5    A    It does.

6    Q    And it shows that beginning in June through

7    December, quite a bit of money was removed from that

8    account?

9    A    Yes.

10    Q    Often times in the amount of $9,000?

11    A    Yeah.  There was multiple $9,000 withdrawals in cash

12    from this bank account.

13    Q    It begins with a $5,000 in June and then it goes to

14    8500 and then begins a number of transactions that come

15    about around $9,000.  Is there -- does a little light go

16    off in your head or something when you see $9,000

17    withdrawals?

18    A    Yes.

19    Q    Why?

20    A    Generally people that are trying to hide money or do

21    something, they do what's called structuring and they

22    structure their cash out of their bank accounts in

23    amounts under $10,000 in order to avoid the reporting

24    requirements by a bank.  Because for any transactions

25    over $10,000 in cash, the bank is required to file a

1    form called a currency transaction report and this is

2    one of the ways that people avoid that report or try to

3    avoid that report being filed.

4    Q    Now, when you looked at this, in particular if you

5    could look around beginning Halloween time, October

6    31st --

7    A    Uh-huh.

8    Q    -- there's some rather large amounts of money going

9    out?

10   A    Yes.

11   Q    Do you see that?

12   A    Yes.

13   Q    In fact, October 31st is an $85,000 check to a Lisa

14   Greenwood?

15   A    Correct.

16   Q    Actually I think the check was probably written to

17   Central Marketing, wasn't it?

18   A    I believe it was.

19   Q    And who is Lisa Greenwood?

20   A    Lisa Greenwood at this time was Dinh's

21   girlfriend/fiancee.  She is currently his wife.

22   Q    And she opened -- she worked at a bank; correct?

23   A    She worked at Bank of America, correct.

24   Q    She opened an account under the name of Central

25   Marketing at a different bank?

1   A   Yes.  The account was opened at Intrust Bank.

2   Q   And she got the $85,000 check, obviously, from

3   Mr. Nguyen?  He wrote the check to her?

4   A   Correct.

5   Q   Later, as you see on December 6 and December 19,

6   there were two more cashier's checks to her or to her

7   business in the amount of 20,000 and $40,000?

8   A   Correct.

9   Q   Did you ask Mr. Shipley, the 90% owner of the

10  business, about these transactions?

11  A   I did.

12  Q   And what did he say?

13  A   He had no idea what Central Marketing was, had no

14  idea if they did anything for the business or why there

15  was even any checks written to Central Marketing or Lisa

16  Greenwood.

17  Q   November 2nd there was $100,000 counter debit taken

18  out.  Were you able to determine where that money went?

19  A   Yes.

20  Q   Where did it go?

21  A   It was two $50,000 cashier's checks, went to two of

22  Dinh's -- what became his sister-in-laws.  I believe one

23  was a sister-in-law at the time and the other one was a

24  fiancee of one of his brother's.

25  Q   And then there's a $10,000 to Tran Nguyen.  Do you

1    know who Tran Nguyen is?

2    A    It's one of Dinh's relatives.

3    Q    So were you able to determine whether these were

4    good expenses, bad expenses, to Lisa Greenwood and

5    Central Marketing?

6    A    Yeah.  What I did to determine whether or not these

7    were business expenses that should be allowed was talk

8    to Mark Shipley, who had no idea what they were for, why

9    they were written to Central Marketing or Lisa

10   Greenwood.  Then I also checked other tax returns to see

11   if any of this income was actually reported anywhere.

12   And nothing was reported for Central Marketing or Lisa

13   Greenwood as to these three checks.

14   Q    So she did not claim them as Central Marketing or

15   personally as income for her?

16   A    Correct.

17   Q    Did you talk to Lisa Greenwood?

18   A    I did.

19   Q    And did she tell you what the money was for?

20   A    I don't remember if I asked her that specific

21   question; but it was never brought up that she had this

22   business.

23   Q    And she never told you that she worked and did

24   marketing business for --

25   A    No.

```
 1    Q    -- Mr. Nguyen?

 2    A    When I interviewed her, she said she worked at the

 3    Bank of America and also she worked for one of Dinh's

 4    brother's other scooter businesses later on.

 5              THE COURT:  What?

 6    BY MR. LIND:

 7    Q    After she worked at the Bank of America, you said

 8    she worked for Mr. Nguyen's brother at a different

 9    scooter store?

10    A    Correct.

11              THE COURT:  Different than the scooter store

12    that we're dealing with in this case?

13    A    Correct.

14              MR. LIND:  Yes.

15              THE COURT:  So there's another scooter store

16    out there?

17    BY MR. LIND:

18    Q    Can you explain to the Court.  We brought it up.  Go

19    ahead and try to explain.

20    A    The business started out as BN Scooters and then it

21    switched names to National Direct Power Sports and Dinh

22    was the one that was involved with the businesses at

23    that time.  At the end of 2006, beginning of 2007, the

24    name switched to Nguyen Nguyen Motor Sports, which was

25    three of Nguyen's other brothers that were running that
```

32

business.  And then about a year or so later after

Nguyen Nguyen, it switched names again to All New

Sports, which was another brother, not any of the three,

it was a fourth brother that opened up that store and

that's where Lisa worked.  And then eventually moved

down to Edmond, Oklahoma and switched names again to

Elite Motor Sports.

          THE COURT:  All right.

Q   Were these particular payments to Lisa Greenwood,

did you count them as legitimate business expenses?

A   I did not.

Q   Okay.  How about the -- any idea the $50,000 checks

written to the sisters-in-law, did you count them as

business expenses?

A   I did not count them as business expenses.

Repayments of a loan are not business expenses.  The

interest would be a business expense; but the principal

repayment of a loan is not.

Q   Okay.  So if it was a loan -- do you know whether it

was a loan?

A   I was told it was a loan but I was not provided with

any paperwork or any other documentation showing that it

was.

Q   And that's just the two $50,000 checks you were told

was repayment of a loan?

1   A    Correct.

2   Q    You were never told that money to Lisa Greenwood was

3   repayment of a loan?

4   A    No.

5   Q    Okay.  Now, Agent Hamor, probably the easiest way to

6   do this would be -- Your Honor, if he could, I'm going

7   to ask him to step down to the elmo and go over Exhibit

8   14 with the Court and kind of explain his process for

9   going through the accounts and how he did it.

10          THE COURT:  All right.

11  Q    Agent Hamor, if you could please, this is Government

12  Exhibit 14, and could you explain to the Court what this

13  is?

14  A    This is the formula for the bank deposits method of

15  proof and it goes through taking all the deposits that

16  go into the bank, then subtracting out anything that's

17  deemed nontaxable deposits, subtracting out the business

18  expenses and then arriving at a net profit for the

19  business.  Since we're dealing with the year 2006, this

20  amount right here, this $3,389,338.53, is the total

21  amount of deposits that went into that, the two business

22  bank accounts at Bank of America.

23  Q    Those are the two accounts we discussed, the 3836

24  and the 5729 account at Bank of America?

25  A    Correct.  Which is further on in this exhibit it

1    shows -- this amount up here where it says grand total,

2    or total deposits, it's the $2.6 million, approximately,

3    and in 5729.  Plus the total deposits of $725,603.45 is

4    what makes up that first number on my calculation of

5    total deposits into the bank account.

6         And from that approximately $3.3 million, from that

7    approximately $3.3 million, you'll see that there was

8    two amounts that were subtracted out of that to arrive

9    at the business gross receipts.  One of the amounts was

10   the nontaxable deposits and the other one transfers

11   between accounts.

12        THE COURT:  What is a nontaxable deposit?

13   A    I will show you that in just a second here.  I'm

14   going to flip back to Page 4 of the exhibit.  In the

15   first account, the one that ends in 5729, what I

16   considered was nontaxable or cash deposits.  I was not

17   able to verify whether those cash deposits were from

18   selling business, scooters, or whether or not it was

19   from some other source, so I gave Dinh the benefit of

20   the doubt that it was not business income and took that

21   out as not being a taxable deposit.  And then also there

22   was a -- in this account there was something that the

23   bank labeled force post credit, which when the deposit

24   was made, the deposit slip and items that made up that

25   deposit didn't add up correctly, so the bank changed it

1    and so that $26 I just gave him the benefit of the doubt

2    that it wasn't taxable.

3        And then in the other account, the one that ends in

4    3836, items that were not taxable, which was a banking

5    advance, so money that's loaned to the business is not

6    taxable when they receive it.  And it's also not expense

7    when they repay the principal portion of those loans.

8    And then there was also a refund that he received.  He

9    paid out something and money came back to him so that

10   wouldn't be taxable.  And also the return item.

11   Somebody gave him a check or something else and then the

12   bank had to return it because the check wasn't good and

13   so that is not -- the redeposit of the money back into

14   his account was not taxable.  So those were the amounts

15   that determined or came up to the nontaxable items on

16   the calculation.

17       And then the other item was the transfers,

18   transfers between accounts.  An account that ended in

19   5729, he used a teller transfer to transfer $15,000 to

20   another account and $6,000 to another account so those

21   amounts would be taken out just because it's shifting

22   the money from one account to another.  There's no

23   income coming into the account.  And that's the same way

24   in the other account 3836.  There was $16,000 transfers.

25   There was another $38,000 in transfers.  And then the

1  ones down below actually show which account they went

2  into which were some other personal accounts of Dinh

3  Nguyen's, $9800 approximately, and approximately $3400.

4  So after I took those amounts out to arrive at what his

5  gross business income was, that came up with that.  But

6  I also point out that the total deposits in each

7  account, there was $605,000 approximately of credit card

8  payments into this account which were people would swipe

9  their credit cards or put their credit card on the web

10 site to pay for scooters, so there was $605 of that out

11 of the approximately $649,000 of what I'm saying was

12 income in this particular account, which is account

13 3836.

14 Q   So most of the income came from the credit cards?

15 A   Correct.  That's the same way with the other, the

16 other bank account also.  There was approximately --

17 down here, there's approximately $2.6 million of

18 deposits from the credit cards into that account.  And

19 the gross receipts that I came up with for that account

20 are approximately 2.637 million dollars.  So, again, the

21 majority of the deposits that were considered gross

22 receipts of the business all came from credit card

23 sales.

24     So that computation comes up with a gross receipts

25 of approximately $3.2 million.  Then I subtracted out

1    what I considered the business expenses of $2 million.

2    And how I arrived at that number was by going through

3    and analyzing all the checks and direct debits that came

4    out of the bank accounts and -- out of account 3836, and

5    I labeled -- there's a number beside each amount that I

6    determined that wasn't business related, that it was

7    personal, and so my calculation, it started out with the

8    $734,000 approximately that was withdrawn from the

9    account.  And the things that I didn't allow as personal

10   were payments to Lisa Greenwood as they weren't reported

11   as income anywhere; payments to Farmers Insurance, which

12   was his personal insurance policy for -- I believe that

13   one was for a vehicle.  Things like to Sedgwick County

14   courthouse for fines, which fines and penalties are not

15   deductible as business expenses.  Again, there was

16   another payment to Farmers Insurance for personal

17   insurance.  And then there's -- one of the -- couple of

18   the big expenses, the ATM withdrawals for $7,860, when I

19   talked with Mark Shipley, he said that, you know, there

20   wasn't any business expenses that were paid with cash,

21   that, you know, everything got paid either with check or

22   direct debits out of the business bank accounts.  And

23   then there was $10,000 withdrawn at Harrah's, which

24   is -- another little over $10,000 withdrawn at Harrah's,

25   which is not for business purposes.

1    Q    And Harrah's is a casino?

2    A    Harrah's is a casino.

3              THE COURT:  Yeah, I know that.

4    A    And then he had several credit cards that he used

5    for -- that Dinh used for the business and I took all

6    the credit card payments out as expenses here and then I

7    analyzed all the credit card statements to determine if

8    those were legitimate business expenses or personal

9    expenses; and my analysis matches up pretty closely to

10   what the defense analysis was of the credit cards as far

11   as what was legitimate business expenses paid on credit

12   cards, but -- so it's not double counted.  I took it out

13   of here.  And then I included it later as part of the

14   analysis of the credit cards and gave them credit for

15   those expenses there.

16        And then the end is just transfers between

17   accounts, which is just moving money from one account to

18   another.  It's not an expense.

19        Then here's the other bank account, the one that

20   ends in 5729.  He paid -- there was a personal taxes

21   paid for Dinh Nguyen of $2000 out of this account that I

22   didn't count as a business expense.  Payments to Mark

23   Shipley and Lisa Greenwood, also the same thing, where

24   she is not reporting any of the income.  Trying to see

25   if there's any other -- Tran Nguyen was that $10,000

1  cashier's check that we discussed earlier that went to a

2  relative.  And then you have the $60,000 check to

3  Central Marketing, which was Lisa Greenwood.  Then the

4  100,000 that went to the two -- what became his

5  sister-in-laws, the two $50,000 add up to 100,000.  Then

6  he withdrew $172,000 of cash that year with a lot of

7  that cash coming out of the last few months of 2006.

8  Again, I didn't allow the cash as business expenses

9  because Mark Shipley said there was no business expenses

10 that were being paid with cash, that all the items that

11 were ordered on the internet were drop shipped to the

12 customers so they would pay by credit card.  The scooter

13 would get ordered through the company and the company

14 would get paid by either a check or direct debit out of

15 the bank account.  Then the scooters would get shipped

16 to the customer.  So there was no cash exchanged as far

17 as the sales of scooters went.

18 Q   I guess that's one point we didn't cover.  You kind

19 of just just briefly covered it, the way the scooters

20 were handled on the internet sales.  They weren't

21 shipped to Wichita and then shipped out to the

22 customers; correct?

23 A   Correct.  Everything that was ordered was drop

24 shipped to the customers.  So BN Scooters or Scooter

25 World, they never physically take possession of the

1    scooter.  It went directly from the company in

2    California to wherever the customer was.

3              MR. THOMPSON:  Excuse me.  I can't see on the

4    screen.  Would you mind giving me the Bates number of

5    that particular chart.  I apologize for interrupting

6    you.

7    A    That's Page 17.  The one that's up right now is Page

8    17.

9              MR. THOMPSON:  Okay.  Got it.

10             THE COURT:  So there was a store here in

11   Wichita, brick and mortar as you put it.

12   A    Correct.

13             THE COURT:  And, what, did they have a few

14   scooters there and people come in, look at a scooter but

15   then order it and it would be drop shipped.  Is that how

16   that worked?

17   A    That's the way it was explained to me.  They had

18   approximately 5 to 7 models, display models at the store

19   of the various types of scooters that were for sale on

20   the internet.  Somebody would come in, they would say I

21   like this model of scooter, they would choose between

22   three colors and they were guaranteed to get one of

23   those three colors because they didn't know when they

24   ordered the scooter if the first color would be

25   available or not, so they would have them choose three

1    colors, then they would say, okay, you're guaranteed to

2    get one of those three colors.  And then the scooter

3    would be directly shipped to the customer.

4              THE COURT:  I see.  All right.

5    BY MR. LIND:

6    Q    So you went through and you looked at the,

7    obviously, all the -- so after going through the bank

8    accounts and looking at what you believe were the

9    deposits, the withdrawals, the business expenses, did

10   you come up with an amount of tax owed by the Defendant?

11   A    I did.

12   Q    For 2006?

13   A    Correct.

14   Q    You did it for more than that year but we're dealing

15   with 2006?

16   A    Correct.

17   Q    What did you come up with?

18   A    When I was doing the calculations for all the years,

19   I was looking at the substance of the transactions, you

20   know, who was benefiting from all these transactions.

21   In 2006 Dinh got $100% of the distributions out of the

22   business.  He's the one that decided on the bank

23   accounts to open.  He's -- Dinh is the one that set up

24   the credit card accounts.  Dinh is the one that made all

25   the decisions for the business.  So everything for the

1    business, Dinh was in charge of.  And when I looked back

2    at 2004 and what Mark Shipley had told me how they

3    reported, on line scooter sales were on Dinh's return

4    and in-store sales were on Mark Shipley's tax return.

5    And then in 2005 where Mark Shipley reported the

6    in-store sales, then there was the other return filed

7    for the business where Dinh only reported 10% of the

8    amount that was on the 1120 S, I looked at how

9    everything for the business ran and computed that Dinh

10   is the one that was in charge of everything and that he

11   should have all of the income and expenses reported on

12   his individual tax returns.  And so that's how I did my

13   computation.  Using the gross receipts that I could

14   determine from the bank accounts, the expenses that I

15   determined from going through the bank accounts; and

16   then the other two pages -- or the rest of the Page 1 of

17   Exhibit 14 and Page 2 of Exhibit 14 are just

18   mathematical computations as far as the tax on the

19   income is based on the mathematical computation and the

20   personal deductions and everything are just, are given.

21   So I came up with a tax due and owing for the year 2006

22   for Dinh Nguyen of $436,796.

23   Q    Okay.  Now, you talked a little bit about how

24   Mr. Nguyen appeared to reap all the benefits from the

25   corporation?

1    A    Correct.

2    Q    Let's talk a little bit about distributions or money

3    he received from the corporation.  How much money did he

4    receive directly from the National Direct Power Sports

5    in 2006?

6    A    I believe the amount was approximately $650,000.

7    Q    Now, he was the 10% owner; correct?

8    A    Correct.

9    Q    If you followed the rules of S corporations, he

10   should have only been able to take 10%.  You're supposed

11   to get -- if we're going to call it a distribution, it's

12   supposed to be in accordance with his share in the

13   stock; correct?

14   A    Correct.

15   Q    You can go a little higher, but it has to be made up

16   later or taxed at a different level; correct?

17   A    Correct.

18   Q    Were you able to determine, did Mr. Shipley get

19   anything from the corporation?

20   A    Mr. Shipley did not get anything out of the

21   business.

22   Q    Okay.  As the 90% owner, he didn't take half a

23   million dollars or something out of it?

24   A    No.

25   Q    Were you able to determine whether Mr. Shipley --

1   you looked at his bank accounts?

2   A   Correct.

3   Q   Did he have any large deposits in his bank accounts

4   of hundreds of thousands of dollars?

5   A   No.

6   Q   Did he make cash withdrawals of hundreds of

7   thousands of dollars to give to his relatives?

8   A   No.

9   Q   What happens to an S corporation if you're the 10%

10  owner and you take more than half a million dollars from

11  the business and the 90% owner takes nothing?  How do

12  you view that as the IRS?

13  A   The IRS takes a view that it is no longer an S

14  corporation.  It invalidates the election to be treated

15  as an S corporation once there's disproportionate

16  distributions.

17  Q   And it's pretty disproportionate here?

18  A   Yes.

19  Q   You're not able to determine whether Mr. Shipley

20  really got any distributions?

21  A   Correct.

22  Q   In fact, you didn't find any?

23  A   Correct.

24          MR. LIND:  I don't have anything further, Your

25  Honor.  I'll pass the witness.

```
 1              THE COURT:  Would you all like to take a short
 2    recess.  Let's do that.  About 15 minutes.
 3                      (Recess.)
 4              THE COURT:  Cross-examination, please.
 5              MR. THOMPSON:  Thank you, Your Honor.  May it
 6    please the Court.
 7              THE COURT:  Yes, sir.
```

## CROSS EXAMINATION

```
 9    BY MR. THOMPSON:
10    Q   Mr. Hamor, just so we make sure we're on the same
11    page.  You understand that today Mr. Shipley -- excuse
12    me -- Mr. Nguyen doesn't contend that he accurately
13    filed his returns and in fact has plead guilty to intent
14    to evade taxes; correct?
15    A   Correct.
16    Q   And, in fact, he has hired someone to look at how
17    much he really owes and that's what we're talking about
18    today.  Right?
19    A   Correct.
20    Q   And just one preliminary comment.  You spent quite a
21    bit of time, it seems to me, on Exhibit 13 and the
22    payments made to Lisa Greenwood.  And those are payments
23    that you treated as personal expenses; correct?
24    A   Correct.
25    Q   Are you aware that Mr. McDaniel and the analysis
```

1    that was done on behalf of the Defendant for today also

2    treated those as personal expenses?

3    A    No.

4    Q    Okay.  Do you disagree with that or you're just not

5    aware of that?

6    A    I wasn't aware that he treated them as personal

7    expenses.

8    Q    Okay.  And if he did, then that's really not an

9    issue of concern to how one ought to properly calculate

10   the tax liability today, is it?

11   A    Correct.  If he did not count them as business

12   expenses.

13   Q    Now, let's talk just a little bit about your

14   analysis.  And I think on your exhibit, or Appendix A,

15   you showed a net profit for the taxes in 2005 of

16   $76,616.50; correct?

17   A    That's not the number I'm looking at.  On Exhibit

18   14?  The one I show has 74,515.50.

19   Q    I guess I was looking at numbers I had from the

20   Government's submission which was filed with the Court

21   on Page 8 where I thought they said that there was a net

22   profit, net profit of $76,616.50.  Is that what I said?

23   A    Yes.

24   Q    And what do you show?

25   A    On Exhibit 14 for the year 2005, the net profit from

1    the business is $74,515.50.

2    Q    And what is shown in 2006 as the net profit?

3    A    $1,206,131.97.

4    Q    Would you agree with me that your calculation shows

5    that the profit margin of this operation that you

6    calculated increased from 2005 to about 6% to 36 or 37%

7    in 2006?

8    A    Yes.  That's what the percentages are, yes.

9    Q    Did you undertake any analysis to determine whether

10   that was a reasonable result of the analysis you did?

11   Or question why the profit margin was so much higher

12   according to your numbers?

13   A    In 2005 it really started advertising on the

14   internet and there was a lot of expenses at the

15   beginning to advertise with Google and Yahoo.  And it

16   appears that in 2006 they continued to advertise with

17   Yahoo and Google, but then the amount that they -- of

18   scooters they sold increased.  And the advertising

19   didn't keep up with, you know, proportionate with how

20   many scooters they sold the following year.

21   Q    But the cost of goods would have increased

22   proportionately with the number of scooters being sold,

23   wouldn't it?

24   A    Correct.

25   Q    So, beyond your looking at the cost of advertising,

1   did you do any other analysis of why there was such a

2   disproportionate profit margin?

3   A   No.

4   Q   Let's talk a little bit about the method you

5   utilized.  And I understand -- and I don't want to

6   repeat things, but to get where I want to go I may have

7   to do just a little bit of that, Your Honor, and I

8   apologize.  You added up the deposits in four bank

9   accounts and you subtracted what you deemed to be

10  allowable expenses.  Correct?

11  A   Correct.

12  Q   And then you treated all the income and all of the

13  expenses as Schedule C income, that is, for Mr. Nguyen,

14  personal income for the year that we have at issue here,

15  2006.  Correct?

16  A   Correct.

17  Q   And the reason you did that, as I understand it, is

18  stated in the Indictment at Paragraph 4, Page 5, and it

19  says because Nguyen disregarded the corporate entity in

20  2004 for tax purposes and the way the business was

21  operated didn't change from 2004 to 2006, you then

22  calculated income and expenses on Schedule C.  Correct?

23  A   Correct.

24  Q   And so your position is that Nguyen disregarded a

25  corporate entity in 2004; but, in fact, you disregarded

1  a corporate entity in your calculations for 2005 and

2  2006; correct?

3  A   I was just being consistent with the way he started

4  reporting the income.

5  Q   Well, let me ask you a little bit about that

6  analysis.  What methodology tells you that the way a

7  person reports income in one year dictates the proper

8  tax analysis of the way they report it in the next year?

9  A   The theory that going over the substance of the

10  transactions over the form of what people are trying to

11  show.  When people -- people do this all the time where

12  they file various business -- try to incorporate various

13  business entities, do various things, to evade their

14  taxes.  And just like Nguyen did here where they set up

15  an S corporation and then try to make him the 10% owner

16  and he gets 100% of the distributions.  By doing that,

17  it allows him to pay a lower tax rate on distributions

18  because they would be taxed at a capital gain rate which

19  is a lot lower than the ordinary income tax rate which

20  he should have paid otherwise.

21  Q   So if you did treat it as an S corporation and you

22  did analyze it, there would be a different tax result

23  than looking at it as you did as all personal expenses;

24  correct?

25  A   If they had done things properly.

1    Q    I mean -- and if you used an S corp form that was

2    filed by the Defendant, if you followed that procedure,

3    it would result in lower taxes; correct?

4    A    It would result in probably lower taxes, yes.  I

5    don't know what the exact figure would be.

6    Q    Now, just the fact that someone does something one

7    way one year doesn't logically mean they'll do it the

8    same way the next year; right?

9    A    Well, if the business is the same, it should be

10   handled the same way.

11   Q    Well, in saying the business is the same, you're

12   working on the assumption that there was an active BN

13   Scooter Corporation in existence in 2004; right?

14   A    Correct.

15   Q    I wonder if you would turn to your Exhibit 11, sir.

16   Near the back of that, there is a Kansas Secretary of

17   State For Profit Corporation.  It says it was filed in

18   2006.  Do you have that page?

19   A    What page is that?  I've got the Articles of

20   Incorporation, three pages associated with that; and

21   then the S election.

22   Q    Is that Exhibit 11, Corporate Resolution?  I guess

23   I'm looking at what was provided to me today and has

24   been admitted in evidence which is -- it says Government

25   Exhibit 11.

1    A    This one that has the by-laws and everything?

2    Q    Yes.

3    A    Okay.  That's 10.

4    Q    Okay.  So we want to go to Exhibit 10?

5    A    Yes.

6    Q    And at the back of that there is a Dissolution

7    Statement; correct?

8    A    Yes.

9    Q    And that's signed by -- excuse me -- didn't mean to

10   tower over you there.  That's signed by Dinh Nguyen and

11   Mark Shipley; correct?

12   A    Correct.

13   Q    It's executed on December 31st, 2004; correct?

14   A    That's the date that was listed on there.  It was

15   filed, however, February of 2006.

16   Q    I understand it was filed later; but these two

17   individuals signed that in 2004; correct?

18   A    I don't know when they signed it because there's not

19   a date by their names.

20   Q    The document's dated December 31, 2004; right?

21   A    Correct.

22   Q    And, in fact, the same thing shows up on what I have

23   marked as Exhibit 12, bank information date -- excuse

24   me -- never mind.  So do you have any knowledge that

25   Dinh and Mark ever really intended to operate BN

1   Scooters as a corporation in the year 2004?

2   A   No, other than the fact that they filed a document

3   with the Secretary of State saying it was a corporation.

4   Q   The fact that you file a document with the Secretary

5   of State as a corporation doesn't mean that you actually

6   end up doing business as a corporation, does it?

7   A   Not necessarily.

8   Q   And it doesn't necessarily mean that that's how you

9   should file your income taxes; right?

10  A   If you are filing -- if you're incorporating a

11  business and intending it to be a corporation, you would

12  file your taxes on a corporate tax return.

13  Q   But it's pretty clear they did not intend BN

14  Scooters to operate as a corporation, isn't that true?

15  A   They did not file their tax returns that way, that's

16  correct.

17  Q   They filed them individually; correct?

18  A   Correct.

19  Q   So you say there was no change between 2004 and

20  2005.  Let's talk about some things that happened in

21  2005.  First of all, we know that National Direct Power

22  Sports, Inc., was formed in October of 2005; correct?

23  A   Correct.

24  Q   And they began doing business as National Direct

25  Power Sports in 2005; correct?

1    A    Correct.

2    Q    And they obtained an Employer Identification Number

3    for National Direct Power Sports in 2005; correct?

4    A    Correct.

5    Q    And they filed a change in their tax filing status

6    in 2006; correct?

7    A    Yeah, they filed an election to be treated as an S

8    corporation.

9    Q    Right.  There's a notebook up there --

10   A    Yes.

11   Q    Would you take a look at Exhibit 2.  That is the

12   Notice of Acceptance as an S corporation; correct?

13   A    Correct.

14   Q    And that was effective October of 2005; correct?

15   A    Correct.

16   Q    That also shows a taxpayer identification number for

17   the new corporation; correct?

18   A    Correct.

19   Q    The fact that the notice was sent out in March of

20   2006, wouldn't that indicate to you that the application

21   had been sent in sometime prior to that?

22   A    Yes.

23   Q    So that's something else that was different and

24   changed from the way in which they operated in 2004 to

25   2005; correct?

54

1    A    What's different?

2    Q    That they filed the election for an S corporation

3    and filed it with the IRS?

4    A    Yes.  They had filed an election for an S

5    corporation, yes.

6    Q    They also filed corporate tax returns for 2005 and

7    2006 for National Direct Power Sports; correct?

8    A    There was one filed, yes.

9    Q    And they attached K-1s to their own individual

10   accounts from that filing to show income that they

11   received, albeit however inaccurate it was, that was

12   done and that was done with regard to those corporate --

13   with regard to their personal returns; correct?

14   A    Only in 2006.

15   Q    They also, in October of 2005, set up the retail

16   showroom separately; correct?

17   A    Yes.

18   Q    And they changed the name on existing bank accounts

19   to show -- at least on one bank account to show it

20   belonged to NDP in October of 2005; correct?

21   A    Correct.

22   Q    And Mr. Shipley testified about that change;

23   correct?

24   A    That the name on the bank account changed, yes.

25   Q    And they retained one in the name of The Scooter

1   Company and that was the one where most of the credit

2   card money was coming into from a prior arrangement;

3   correct?

4   A    Correct.

5   Q    All right.  The company started a new check

6   numbering sequence when the NDP name was attached to the

7   existing bank account and the NDP was used as the name

8   on checks written starting in 2005.  Do you agree with

9   that?

10  A    Yes.

11  Q    Credit card was obtained in the name of National

12  Direct Power Sports at that time also; correct?

13  A    I'm not exactly sure when it was obtained; but there

14  was one.

15  Q    But they did get one?

16  A    They did get one, yes.

17  Q    And there was additional capital infused into NDP in

18  late 2005; correct?

19  A    I'm not aware of what you're talking about there.

20  Q    Okay.  You've talked about $100,000 being paid to

21  some family members.  Are you aware that the $100,000 in

22  money came into the corporation in 2005?

23  A    There was nothing deposited into the bank account to

24  indicate that.

25  Q    Do you know whether there was any cash utilized in

1    that regard?

2    A    I was not aware of any cash that was utilized.

3    Q    So if it was, that would not have been accounted for

4    in your analysis; correct?

5    A    That is correct.

6    Q    None of these things were being done prior to 2005;

7    correct?

8    A    Nguyen -- Dinh Nguyen was using the EIN for BN

9    Scooters on his Schedule C to indicate that that was a

10   business in 2004.

11   Q    But he filed his personal returns; correct?

12   A    Yes.

13   Q    Now, we talked a little bit about the ownership

14   interests of the company.  And you indicated, and I

15   think Mr. Shipley also testified, did he not, that the

16   ownership was to be Dinh as a 10% owner and Shipley as a

17   90% owner.  Correct?

18   A    When I interviewed Mr. Shipley, he stated that

19   that's the way it was on paper but he had no idea why it

20   was that way or why it was even set up that way.

21   Q    Well, at the grand jury, didn't he testify that the

22   reason it was done that way was because Dinh was still

23   in school and it was a greater risk for Shipley, thus,

24   he owned 90% and Dinh owned 10%?

25   A    In the grand jury he did say that, yes.

1   Q   And that was a reason, then, for the allocation,

2   according to Mr. Shipley, at the time the company was

3   filed; correct -- was formed?

4   A   His understanding and what he explained to me was

5   that the 90/10 split was for that -- in-store sales and

6   not the internet sales.

7   Q   And when did he reflect -- when did he state that to

8   you?

9   A   The first time I interviewed him.  I don't have that

10  memo in front of me so I can't recall the exact date;

11  but that it was probably 2009.

12  Q   I'll get back to that in a minute.

13  A   Okay.

14  Q   So Mr. Shipley also testified before the grand jury,

15  did he not, that 90% ownership meant he was responsible

16  for 90% of the bills and would get 90% of the profits?

17  A   Correct.

18  Q   We know that probably didn't happen, but that was

19  his understanding; correct?

20  A   Correct.

21  Q   And the way an S corporation would file its return

22  would be to attribute net income in proportion to the

23  ownership interest of the parties; correct?

24  A   Correct.

25  Q   And the fact that one partner may be cheating

1    another doesn't change the filing rules for the IRS,

2    does it?

3    A    It depends on what exactly happened with the

4    business.

5    Q    But, I mean, if Mr. Shipley thought he was entitled

6    to more money, that's kind of a separate claim from the

7    rules that apply to the filing of an S corporation,

8    which is, that the corporation passes a net income or

9    loss through to its individuals in proportion to their

10   ownership interest; correct?

11   A    Yeah.  If there was a dispute between what Shipley

12   thought he should be receiving and what Dinh was

13   receiving, then, yes, that would be separate.

14   Q    And to file an S return, one files a corporate

15   return first, or prepares a corporate return; correct?

16   A    Correct.

17   Q    And that should include all the corporate income;

18   correct?

19   A    Correct.

20   Q    And that should include all the corporate expenses;

21   correct?

22   A    Correct.

23   Q    And then you should attribute that to the

24   individuals in the proportion to their ownerships;

25   correct?

1    A    Correct.

2    Q    And that treatment is different than the treatment

3    in some respects that you would afford to a person who

4    is just filing a personal return, wouldn't it?

5    A    The difference would only be for an S corporation

6    return, the income or loss would be split according to

7    the ownership percentage; whereas, the sole

8    proprietorship would all be reported on one person's tax

9    return.

10   Q    But, for example, I think what you did, what you did

11   was look at all the money that went to Dinh, and those

12   would really be treated as distribution of funds from a

13   corporation; correct?

14   A    There were a lot of personal expenses and various

15   things paid to Dinh Nguyen, or on his behalf, out of the

16   business bank account.

17   Q    But it's a distribution -- if it's treated as a

18   distribution from the corporation to Mr. Nguyen, that

19   has several different ways it can be treated for tax

20   purposes, doesn't it?

21   A    There are a lot of rules that apply to S

22   corporations on how money coming out of the corporation

23   should be treated.  And as far as S corporation, neither

24   one of them took a salary, which is something they

25   should have been doing because you can't give

1    distributions from corporations generally without having

2    paid a salary or something.  S corporation, the

3    distributions are supposed to be proportionate, which in

4    this case they weren't.  So there was many things that

5    they did that weren't reflected properly for an S

6    corporation.

7  Q    And so to determine how much tax is owed what we

8    ought to do is look at how it should have been done for

9    this corporation.  Isn't that correct?

10  A    Correct.

11  Q    Let's talk just a little bit about the division of

12    in-store income and internet sales.  I believe you

13    approached Mr. Shipley first in February of 2009; is

14    that right?

15  A    I don't remember the exact year.

16  Q    It was -- or at least a copy of the report says

17    2009.  And you mentioned that he told you that in his

18    first interview.  And I think these were all provided by

19    the Government.  I wonder if you would take a quick look

20    at that, the first interview, where he talked about the

21    in-store sales?

22  A    The one I -- what I wrote up here in February was a

23    memorandum of conversation because he did not talk to

24    me.  So there was no interview completed or done at that

25    time.

```
 1            MR. THOMPSON:  I think, to be clear, I'd like
 2   to mark this as an additional exhibit, Your Honor.  I
 3   apologize.
 4            THE COURT:  You may.
 5            MR. THOMPSON:  If I could submit that to the
 6   Court and mark it as Exhibit 10.
 7                      (Defendant Exhibit 10 marked for
 8                       identification.)
 9            MR. THOMPSON:  I'd ask that Exhibit 10 be
10   considered as part of the record Your Honor.
11            THE COURT:  It will.
12   BY MR. THOMPSON:
13   Q   So there's another interview then on March 11, 2011;
14   correct?
15   A   There was one done then, yes.
16   Q   And in that, Mr. Shipley said he didn't deal with
17   the bank or make deposits; correct?
18   A   Correct.
19   Q   And was that kind of consistent with your general
20   understanding of what Mr. Shipley's knowledge about how
21   some of the business operated?  He wasn't directly
22   involved in that?
23   A   Correct.
24   Q   And yet you credited his statement that he didn't
25   know about any cash deposit or expenses, but he wouldn't
```

1    have had any reason to know whether they were or were

2    not, would he?

3    A    What I asked him was what was the procedures for the

4    business, how did it operate.  And whether or not they

5    received cash for scooter sales either in the store,

6    over the internet.  He said he didn't know about the

7    internet but he had received cash in the store.  And

8    didn't know why somebody would send cash in the mail to

9    pay for a scooter because everything was done by credit

10   card.

11   Q    How about purchases of inventory?  Do you have any

12   idea how that was done, whether Mr. Nguyen would have

13   paid cash for purchases of inventory with suppliers out

14   of California?

15   A    I don't know if he paid it in cash or not.

16   Q    And you didn't really have either an opportunity or

17   were unable to discern whether that occurred; correct?

18   A    I did not.

19        THE COURT:  What are we talking about here

20   inventory?  My understanding, maybe not a complete

21   understanding, is that he might have purchased four or

22   five or six scooters to put on the showroom floor; but

23   as far as the customers are concerned, they received

24   drop ship -- they received the scooters by drop ship.

25   What are we talking about here?

1          MR. THOMPSON:  It's my understanding he also

2     had to make payments in advance for those drop shipments

3     to the suppliers from which they came.

4          THE COURT:  All right.  If that's what the

5     evidence is going to be.

6     Q   So --

7          THE COURT:  Wait a minute.  The customer buys,

8     through the internet, a scooter.  And uses a credit card

9     and presents the credit card to who at that point?

10          MR. THOMPSON:  To the business.  I'll give you

11     my understanding, Your Honor.  To the business.

12          THE COURT:  Okay.  All right.  And then what

13     happened?  Did the business then in effect pay the

14     scooter manufacturer?

15          MR. THOMPSON:  Yes.  The supplier.

16          THE COURT:  The supplier.  And the supplier

17     sent the scooter to the customer.

18          MR. THOMPSON:  Yes.

19          THE COURT:  I suppose I'm going to hear all of

20     this.

21     BY MR. THOMPSON:

22     Q   I think someone had inventory.  I guess my point was

23     if there were cash transactions, whether proper or not,

24     recorded proper or not, that was something that you

25     really didn't look at or --

1    A    I gave Dinh Nguyen the benefit of the doubt that

2    cash deposited into the bank account was not from the

3    sale of scooters.

4    Q    In all instances?

5    A    In all instances.

6    Q    I'm looking for the statement he made to you about

7    the store handling, how it was going to be allocated

8    between them.

9              THE COURT:  You're talking about Shipley made

10   to him?

11             MR. THOMPSON:  Yes.

12   A    Looks like on Page 1608 of yours, Paragraph 26.

13   BY MR. THOMPSON:

14   Q    So you're looking at Page 26?

15   A    Paragraph 26.

16   Q    And that says Shipley says he wasn't sure about how

17   the process worked with him as the 90% shareholder and

18   Nguyen as the 10% shareholder; correct?

19   A    Yeah, that he was not familiar with the set up of

20   the business.

21   Q    That doesn't say that he understood how the tax form

22   would be filed; correct?

23   A    The paragraph above that he said he couldn't

24   remember the kinds of books and records; but there's

25   only one bank account for the local store and he only

1    had the one bank account.

2         I think there was a paragraph says the figures on

3    the tax returns are for the local store only and Shipley

4    and Nguyen did their own bookkeeping.

5    BY MR. THOMPSON:

6    Q    Pardon.  Where was that?

7    A    Paragraph 23 up above there.

8    Q    Each did their own.  But what I'm asking you about

9    is the tax return and where he told you that the figures

10   on the corporate tax returns reported the store income

11   figures only?

12   A    Paragraph 23.  Shipley identified 2005, 2006 form

13   1120 S for National Direct Power Sports as the one he

14   signed.  The figures on the tax return for the local

15   store only and Shipley and Nguyen did their own

16   bookkeeping.  So that was him telling me that this is

17   only the sales from Scooter World brick and mortar

18   store.

19   Q    And if the sales had been included, attributable to

20   him, he would have had a much higher tax liability;

21   correct?

22   A    If all the -- if he was truly the 90% owner and he

23   recorded the sales from the internet business and not

24   just in-store sales, there would have been more income

25   reported for the business, correct.

1    Q    But he didn't really know how the internet sales

2    were handled, did he?

3    A    No.

4    Q    And he says he honestly didn't know what kind of

5    numbers or figures they dealt with on that side;

6    correct?

7    A    Correct.

8    Q    Were the proceeds from internet sales and the

9    in-store sales all deposited in the same accounts?

10   A    There was two bank accounts that primarily all the

11   money from the internet sales went into.

12   Q    And those were the two you identified previously;

13   correct?

14   A    Correct.

15   Q    They didn't have a separate account for internet

16   sales and in-store sales, did they?

17   A    No.

18   Q    The bills and expenses were all paid out of the same

19   accounts; correct?

20   A    Correct.

21   Q    There wasn't a separate account for in-store sales

22   and internet sales; correct?

23   A    Correct.

24   Q    And was a separate inventory kept or any record kept

25   that you know between internet and in-store sales?

1    A    I was not provided with any records for the

2    business.

3    Q    So all the money was commingled as to those two

4    sources in the accounts controlled and owned by National

5    Direct Power Sports; correct?

6    A    Correct.

7    Q    I want to ask you a little bit about some of your

8    calculations and your income calculations.  And I'd like

9    to look at Appendix B-1, I think, just to make sure

10   we're walking through it correctly.  And I think that's

11   in our Exhibit 8.  I'm not sure what the Government

12   exhibit is on that.  Our Exhibit 8, Your Honor, has

13   Bates page number G000207.

14            THE COURT:  I'm looking at it.

15   BY MR. THOMPSON:

16   Q    Do you have that in front of you?

17   A    Yes.

18   Q    Now, as I understand what you did, you looked at all

19   the deposits and then you included those items that you

20   believed were not income and you backed that out to come

21   up with the bottom line income figure; is that correct?

22   A    Correct.

23   Q    And those with a number to the side on Exhibit B-1,

24   for example, are items that you backed out and

25   considered as not income; correct?

1    A    Correct.

2    Q    And everything else was considered to be income;

3    correct?

4    A    Correct.

5    Q    And if you'll turn to B-1, the next page, which is

6    Page 3.  That's for 2005; correct?

7    A    Yes.

8    Q    And there are some funds transfer credits on the

9    Page 4 from Nguyen Nguyen and Nguyen Nguyen Auto Group

10   of 20,000 and $50,000; correct?

11   A    Correct.

12   Q    And you didn't back that out; correct?

13   A    Correct.

14   Q    So that was treated as income; correct?

15   A    Correct.  In 2005.

16   Q    And what information did you have that you based

17   that decision on?

18   A    They are the one that had the scooter business next.

19   Q    Well, they had -- sometime after 2005 or 2006; is

20   that correct?

21   A    They started it in -- I think they filed their

22   paperwork I believe in 2006 but it looks like they

23   started doing stuff in 2005.

24   Q    But what I'm asking you is how do you know that

25   these funds were not loans to Dinh from his brothers as

1  opposed to something else?

2  A   Based on tax returns and income that they reported

3  on their tax returns not being able to support making

4  that sort of a loan.

5  Q   You went to their tax returns and said they didn't

6  have money to make loans; is that right?

7  A   Correct.

8  Q   And what judgment did you make to play into making

9  that decision?

10  A   Just based on the limited amount of income that they

11  reported each year.

12  Q   But that doesn't indicate whether or not this money

13  that Dinh received was intended to be a loan, does it?

14  A   No.

15  Q   And you didn't interview the brothers; correct?

16  A   I tried to interview the brothers.

17  Q   But you did not?

18  A   I, I wasn't allowed to interview the brothers, yes.

19  Q   I didn't stop you?

20  A   No, you didn't.

21  Q   So you concluded that this is somehow an income as

22  opposed to a loan; correct?

23  A   Correct.

24  Q   And how about Nguyen Nguyen Auto Group, $80,000, you

25  made the same conclusion on your own; correct?

1   A   Yes.

2   Q   And you had no documentation to support that

3   conclusion one way or the other, did you?

4   A   No.

5   Q   And, in fact, you made a lot of determinations kind

6   of just using your own judgment; correct?

7   A   The income that I determined for 2006 was mostly

8   credit card sales and then a few checks that are on

9   there.

10  Q   Okay.  But there were also money going out to these

11  individuals in 2006; correct?

12      You talked about $50,000 going out to sisters-in-

13  law?

14  A   Yes.

15  Q   And you said if it was a loan, you said the

16  repayment of a loan is not an expense; correct?

17  A   Correct.

18  Q   And are you aware that Mr. McDaniel didn't treat it

19  as an expense?

20  A   I am not aware of what he treated as expenses.

21  Q   But if that was a repayment of a loan, for example,

22  there would have been a loan coming in in the first

23  place; correct?

24  A   What I believe in Mr. McDaniel's report was that

25  that was all cash and that nothing got deposited into

1    the bank for that.

2    Q    But cash can still be a loan; correct?

3    A    Cash can still be a loan.

4    Q    And you ought to report it correctly on the tax

5    return; correct?

6    A    Correct.

7              THE COURT:  What does counter credit mean on

8    these exhibits?

9    A    That was more than likely him going into the bank

10   and making a deposit at the counter of the bank.

11             THE COURT:  Well, in other words, the bank

12   records show a deposit slip with these names on them

13   or --

14   A    Yes.

15             THE COURT:  Where did all of this information

16   come from is what I'm trying to figure out.

17   A    That came from the checks associated with the

18   deposit slip that was at the bank.  And those were all

19   deposits that were made physically in the bank.

20             THE COURT:  All right.

21   BY MR. THOMPSON:

22   Q    Those were checks deposited in the account of

23   National Direct Power Sports or a d/b/a account from the

24   individuals identified on Appendix B-1; correct?

25   A    Correct.

1    Q    Those were all treated as income?

2    A    Yes.  And in the memo section of the check it would

3    list on several of them that it was for whatever type of

4    scooter that they were buying.

5    Q    Was that on all of those checks?

6    A    Not on all of them.

7    Q    Okay.  Do you remember, was it just one check?

8    A    There were several checks that had that listed in

9    the memo section.

10   Q    Were these amounts that you reference here, were

11   those the checks that you're talking about had scooters

12   on the memo?

13   A    The counter credit are all checks.  I can't tell you

14   exactly which ones had the memos by looking at this; but

15   I have that.

16   Q    Now, you didn't pick up any cash deposits as income;

17   correct?

18   A    Correct.

19   Q    Let's talk a little bit about expenses.  And I want

20   to, I think, look at C-2.  I just am again trying to

21   pinpoint exactly how you did certain things and trying

22   not to go through every single entry, which perhaps the

23   judge, I hope, will appreciate.

24             THE COURT:  You said C-2?

25             MR. THOMPSON:  Yes, Your Honor.

```
1              THE COURT:  Is that on 00246?

2              MR. THOMPSON:  That's where it starts.

3              THE COURT:  Okay.  Well, maybe not.  Give me

4    the Bates page, would you, Lee.

5              MR. THOMPSON:  236.

6              THE COURT:  Okay.  Thank you.

7    BY MR. THOMPSON:

8    Q    The numbers to the right indicate things that you

9    disallowed as expenses; correct?

10   A    Correct.

11   Q    And there's a whole list of those that were

12   transferred to various accounts, including the $182,000;

13   correct?

14   A    Correct.

15   Q    And how did you determine that that was not an

16   expense?

17   A    Because it went into another one of Dinh's bank

18   accounts.

19   Q    And what did he do with the money when it went into

20   his account?  Do you have any idea?

21   A    Spent it on various personal stuff.

22   Q    He gambled, I understand?

23   A    He gambled a lot of it, yes.  But that's not a

24   business expense.

25   Q    Do you know whether he used -- I know that's not a
```

1    business expense and we're not saying it is.  But was

2    any of that also utilized in connection with the

3    business?

4    A    Not according to my analysis that I did of that

5    account.

6    Q    Okay.  And your analysis looked at every check he

7    wrote and everything he did with it?

8    A    Yes.

9    Q    All right.  How about -- you mind if I ask a quick

10   question, Your Honor?

11             THE COURT:  I thought that's what you've been

12   doing.

13             MR. THOMPSON:  Of my consultant.

14             THE COURT:  Sure.

15                   (Off-the-record.)

16   BY MR. THOMPSON:

17   Q    It's your testimony that account 4025 was one of

18   Dinh's accounts as opposed to maybe one of his brother's

19   accounts?

20   A    He was a signor on that account.  I don't know the

21   exact name that's on that account.

22   Q    Did you analyze what his brother might have done

23   with the money?  Whether it went back to the brother as

24   repayment of a loan or anything like that?

25   A    No.

1    Q    And how about funds transferred debit, 192,000?

2    That's right up above that?

3    A    Yes.

4    Q    Entry number 23?

5    A    Yes.

6    Q    What was that?

7    A    Those were transfers to various other of his

8    accounts, some of them.  I think a couple of those

9    transfers actually went to other family members, their

10   bank accounts, also; but on the slip -- or on the bank

11   statement it just said fund transferred debit.  It

12   didn't identify the exact account that it went in or

13   went to; whereas, on the other ones, when I was typing

14   it in on the spread sheet, it had it delineated on there

15   but I didn't look to see where those amounts went.

16   Q    So without knowing what it was, you concluded that

17   it was not a business expense?

18   A    I looked at the deposit slips and the debit slips

19   that the bank provided for those transactions to

20   determine whether it was.

21   Q    I'm just curious, Mr. Hamor, whether you have ever

22   encountered in your experience applying -- disregarding

23   a corporate entity based upon prior conduct of an

24   individual.  For example, you said they disregarded the

25   corporate entity in 2004; therefore, they're

1    disregarding the corporate entity in 2005 and 2006.

2    Have you ever had occasion to do that before?

3    A    Yes.

4    Q    Okay.  And how often?

5    A    It doesn't happen very frequently, but it does

6    occur.

7    Q    And -- but in doing that, you disregard the new

8    corporation completely; correct?

9    A    I look at the substance of the transactions to

10    determine the way it should be treated versus what

11    they're trying to convey in order to potentially get out

12    of paying their income taxes.

13    Q    And that's purely a subjective analysis; correct?

14    A    Based on the evidence that I have gathered.

15    Q    That's based upon a procedure and an approach that

16    you develop based upon your own knowledge, not as it

17    relates to any tax rule or any other doctrine?

18    A    Based on the internal revenue laws and related

19    treasury regulations and things that govern how income

20    and expenses are treated for tax purposes.

21    Q    I understand that.  But I'm just trying to get this

22    substance over form argument.  The substance that you're

23    analyzing is to recreate a set of books that is

24    different from the actual corporation doing business;

25    correct?

1    A    I'm not sure I understand the question.

2    Q    You created a set of books for Mr. Nguyen that was

3    not done in the same way as the corporation would have

4    done it; correct?

5    A    Based on what was told to me by Shipley is that this

6    BN Scooters, National Direct Power Sports, that was

7    reported on the corporate tax return and then everything

8    else was Dinh's personal stuff.

9    Q    And you did that because you believed that

10   everything was done the same way as it had been done

11   before?  There were no changes between '04 and '05 and

12   '06; correct?

13   A    Correct.

14          MR. THOMPSON:  I don't have any further

15   questions, Your Honor.

16          THE COURT:  Redirect, please.

17          MR. LIND:  I don't have anything further, Your

18   Honor.

19          THE COURT:  All right.  It's 20 'til 12.  You

20   all want to take a noon recess?  How do you want to

21   handle this?  You've got your expert here.  How long

22   will he take, Erin?

23          MS. THOMPSON:  Probably about the same as

24   Agent Hamor.

25          THE COURT:  I suppose it would be better to

1   take the noon recess a little early, don't you suppose,

2   because I assume you don't have any further witnesses.

3           MR. LIND:  I do not, Your Honor.

4           THE COURT:  All right.  Let's take a recess

5   until 1:00 and we'll finish up.  All right.

6           MR. LIND:  Thank you, Your Honor.

7           MR. THOMPSON:  Thank you.

8               (Noon recess.)

9           MS. THOMPSON:  May it please the Court.

10  Defense calls Dale McDaniel.

### DALE McDANIEL

12  Having been first duly sworn to tell the truth, the

13  whole truth and nothing but the truth, testified as

14  follows on:

### DIRECT EXAMINATION

16  BY MS. THOMPSON:

17  Q   Mr. McDaniel, will you please introduce yourself to

18  the Court and tell him what you do for a living?

19  A   My name is Dale McDaniel.  D-A-L-E, M-C-D-A-N-I-E-L.

20  I'm a Certified Public Accountant in Oklahoma City.

21  I've been in private practice there in that capacity

22  since 1998.

23  Q   And what do you do in your private practice?

24  A   A variety of things.  Prepare some tax returns, not

25  a lot, but some.  A lot of consulting on primarily civil

1    matters and a few criminal.  A lot of embezzlement loss,

2    I end up working on those.  And for the last probably

3    nine or ten years, probably spent half my time

4    consulting for large banks, training their employees in

5    the law and the requirements on anti money laundering

6    provisions and bank secrecy act law, things like that,

7    and assisting them in preparing suspicious activity

8    reports where that's necessary.

9    Q    What did you do prior to going into private practice

10   in 1998?

11   A    I worked for IRS criminal investigation for 25

12   years.  Started in May of '73.  Retired in July of '98.

13   Q    What positions did you hold with the IRS?

14   A    I was a special agent in Dallas, and Oklahoma City.

15   I was a supervisory special agent in Oklahoma City.  And

16   I ended my career, the last few years of it, as what was

17   then known as a branch chief.  It's now called assistant

18   special agent in charge.  In Oklahoma City.  I had --

19   initially in that position I had the states of Oklahoma

20   and Kansas under my supervision; and then later on, as a

21   result of some reorganization, I had Oklahoma and

22   Arkansas.

23   Q    There should be an exhibit notebook up there.  If

24   you look at Exhibit 6, is that a current copy of your

25   C.V.?

1    A    Yes, it is.

2    Q    When you joined the IRS what kind of training did

3    you receive?

4    A    Went through about six months of training in

5    Washington D.C. at that time.  It consisted of an

6    initial course in the income tax law.  Followed by a

7    course in general investigative procedure that would be

8    applicable to all federal law enforcement.  And then

9    investigative procedure course that was specific to IRS

10   violations.

11   Q    Did you ever lead training when you were with the

12   IRS?

13   A    Yes, I did.  I became an instructor in 1988 and I

14   instructed numerous courses after that in the district,

15   in other districts, in Washington, and Federal Law

16   Enforcement Training Center in Glenco, Georgia,

17   instructed numerous basic training classes for new

18   agents.

19   Q    What kind of courses did that include?

20   A    It included instruction in tax law and investigative

21   procedure both.

22   Q    And have you provided testimony as an expert in your

23   private practice previously?

24   A    I've done that in civil cases.  I have not done it

25   in criminal cases.

1    Q   And is there a reason you haven't done it very often

2    or at all in criminal cases?

3    A   I've really avoided criminal cases somewhat.

4    Especially where IRS is the investigating agency.  I

5    have a feeling about that that I've avoided opposing the

6    IRS and so I particularly in tax cases haven't done a

7    lot of testifying in that respect.

8    Q   Was there something in this case about why you chose

9    to testify?

10   A   I saw the age of the defendant and felt a little bit

11   sorry for him.  He's about the age of my sons.  And so

12   I, I was concerned about his future and when I saw the

13   calculation, I disagreed with some of the methods that

14   were used on it and thought that he needed some help in

15   pointing those out.

16   Q   When you were with the IRS did you testify as an

17   expert witness?

18   A   No, I testified in trials; but generally the expert

19   witness in those trials would have been a revenue agent

20   testifying about the tax computation; whereas, my role

21   would have been testifying about other things so it

22   wouldn't have been called an expert witness.

23   Q   Did you testify in tax evasion cases when you were

24   at the IRS?

25   A   I did.

1    Q    And do you know approximately how many you did?

2    A    I don't remember how many there were.  I know that

3    I've testified in criminal cases, in tax court cases.

4    I've testified in -- before grand juries.  I don't know

5    what the number is.  Several.

6    Q    And you mentioned Mr. Nguyen's age.  In your

7    experience both with the IRS and in the private sector,

8    have you seen anybody as young as Mr. Nguyen was when

9    the offenses were committed charged with tax evasion?

10   A    It's pretty unusual.  I don't think I've ever

11   seen -- in 25 years, I don't think I saw anybody his age

12   that got prosecuted for something like this.

13   Q    And in both your experience with the IRS and in the

14   private sector, have you had cases of tax evasion or tax

15   fraud that involved the Asian culture?

16   A    I've seen several cases that were done under my

17   supervision where the Asian culture was involved.  And

18   so I'm familiar with the nature of those and some of the

19   problems that go with them.

20   Q    What's unique about the Asian culture or what

21   problems does it present?

22   A    What I've noticed in the Asian culture is that

23   there's -- there are very close family ties very often,

24   and a lot of times there are family financial matters

25   that take place, loans back and forth between family

1    members, without any paperwork usually.  There's a great

2    deal of trust in families.  And the troublesome part of

3    that from the investigative standpoint, it's very

4    difficult to tie those things down sometimes.  You don't

5    always know -- when you see things, you don't know what

6    they are, you can't tell always what they are.  I know

7    that's something that agents typically dread in those

8    kind of cases because it makes it very difficult.

9    There's cash and you can't tie it down.

10   Q    Let's talk specifically about tax evasion cases.  Do

11   you always use the same approach when you're determining

12   what the correct taxable income is?

13   A    No.  You sort of let the facts of the case determine

14   the approach you're going to use.  You look and see

15   what's the best way to do it and then follow that way.

16   Don't just look at one method; but you figure out what's

17   going to work the best in this case.

18   Q    What are the different methods of proof?

19   A    Essentially there are two broad categories.  There's

20   a direct method, which is sometimes called specific item

21   method.  And if you have a good set of books and

22   records, you can specifically identify items of income

23   and expense that might be omitted from a tax return.  Or

24   improperly reported.  And so you can use a specific item

25   method and that's the preferable one because it's more

1    definite, you can see specifically what you're looking

2    for.

3        The other methods are called indirect methods.

4    There are several of those.  One of them was used in

5    this case.  It's a bank deposits and cash expenditures

6    method is what it's usually called.  And it's not

7    specific items because you're relying upon inferences

8    about the nature of bank deposits and expenditures from

9    bank accounts and so forth.

10   Q   Are there some problems that arise when you use the

11   bank deposits method?

12   A   Absolutely.  There's some common problems in every

13   indirect method.  Certainly that's the case with bank

14   deposits.  One of those problems is, we've talked about

15   cash already, and one of the problems in an indirect

16   methods case is cash.  One of the things that agents are

17   taught on indirect methods cases when they interview the

18   subject of the investigation is to find out how much

19   cash they had on hand at the starting point of the

20   investigation because it's so crucial.  If you carry

21   cash into the year, it might be used for business

22   expenses that would be deductible and it wouldn't show

23   up in the bank account.  So, beginning cash on hand is a

24   critical factor.  And then cash expenditures during the

25   year, if money never hits the bank account, it's very

1    easy to miss those transactions in the bank deposits

2    method because you're relying very heavily on what is in

3    the bank account.  So whatever is not in the bank

4    account is a problem.

5    Q    What was your assignment in this case?

6    A    I was asked to take a look at the Government's

7    computation of unreported income and tax to determine

8    whether there were any errors or inconsistencies in that

9    computation and to make a computation correcting any of

10   those errors and inconsistencies that I detected.

11   Q    If you turn to Exhibit 5 in that notebook.  Is that

12   a copy of the report you prepared?

13   A    Yes, it is.

14   Q    It has the attached schedules?

15   A    Yes.

16   Q    And what documents did you review when you were

17   completing this assignment?

18   A    We obtained from the Government many of the things

19   that Special Agent Hamor testified about this morning.

20   We had bank account records; credit card records.  We

21   had their spread sheets that he mentioned that he had

22   prepared, those were furnished to us, Excel spread

23   sheets.  And actually that's a large part of what I used

24   as a starting point for myself.  Rather than recreate

25   all of that, we used the spread sheets that had already

1    been done by the Government.  And, of course, I had

2    access to the same records he used in terms of the bank

3    records and the credit card records and so forth.  And

4    that's mostly what I had.

5    Q   And those are listed on Page 1 of your report; is

6    that correct?

7    A   Yes, they are.

8    Q   Did you talk to any witnesses in preparing your

9    assignment?

10   A   I did.  I talked to -- I talked to Mr. Nguyen.  And

11   also talked to Mr. Shipley.  Who both had insight to the

12   nature of the transactions that occurred.

13   Q   And how did you approach your interview with

14   Mr. Nguyen?

15   A   Handled it a lot like I would have handled a meeting

16   with a subject of an investigation back in my old days

17   when I was an agent.  I asked him about the

18   transactions, how he did business; and we took the

19   spread sheets that I had and we went over those line by

20   line to get him to classify what those expenditures

21   were.  And I had already gone over them myself so I had

22   identified certain transactions that seemed out of the

23   ordinary to me as I reviewed them.  And so I

24   specifically zeroed in on those because they looked like

25   they didn't belong there.  There was something unusual

1   about them, let's say.  And so we went over everything

2   that went through the bank account, both deposits and

3   withdrawals, line by line.  And we did the same thing

4   with the credit card worksheets.  Went over those line

5   by line to determine what the proper classification of

6   the items was.

7           THE COURT:  I'm going to interrupt you for a

8   minute, Mr. McDaniel.

9   A   Yes, sir.

10          THE COURT:  I'm going to hear his testimony;

11  but I may not credit anything that the Defendant told

12  him.  Now, I recognize that at sentencing the rules of

13  evidence technically don't apply; but I'm not sure that

14  I buy that in a situation like this.  I'll let the

15  lawyers write me a little brief about it.  But this

16  Defendant declined to be interviewed, asserted his Fifth

17  Amendment rights, which was his right and I don't hold

18  that against him.  He also did not give any information

19  to our probation office when he was interviewed.  Now he

20  wants me, through this witness, to in effect believe

21  him, that is, believe the Defendant, not this witness,

22  with respect to these various items that Mr. McDaniel

23  just talked about.  That may not be a problem if the

24  Defendant testifies as well here today and can be

25  cross-examined.  But ordinarily, you all know this,

1    lawyers know, anyway, the *Savianno* case does not allow

2    exculpatory hearsay and that's probably what this is

3    going to be.  I said I'm going to hear it for the

4    record, so we don't waste time on something like this,

5    but I may not credit it.  I'm just letting you know.

6    All right.  Now you may go ahead, Erin.

7              MS. THOMPSON:  Thank you.

8    Q    You also talked Mr. Shipley?

9    A    I did.

10   Q    And if you look at Exhibit 3, can you describe what

11   that is?

12   A    That's a signed statement we obtained from

13   Mr. Shipley as a result of the interview with him.

14   Q    And can you describe the process you used when you

15   interviewed Mr. Shipley?

16   A    I, along with an associate of mine who's a retired

17   FBI agent, met with Mr. Shipley and we interviewed him

18   about the nature of his relationship with Mr. Nguyen and

19   the businesses that they were involved together in;

20   obtained the details that we thought would help us to

21   know how to classify items that we would see in bank

22   accounts; and we reduced what he said to a signed

23   statement -- or to a statement for him to sign.  We

24   furnished that statement to him, he reviewed it,

25   initialed each page, and signed the statement.

1    Q    Did Mr. Shipley ever tell you that he and Mr. Nguyen

2    intended to separate online sales of scooters from in-

3    store sales of scooters?

4    A    Just to the contrary.  He said that was never their

5    intention, that they intended to do business under one

6    entity and one entity only.

7    Q    And is that reflected in that report?

8    A    Yes, it is.

9    Q    And did Mr. Shipley ever tell you that he intended

10   the corporate return he filed to be just the in-store

11   sales?

12   A    No.  I asked him about that corporate return.  The

13   return seemed -- it looked a little odd to me because of

14   the nature of the numbers that were reported, a lot of

15   them were round numbers, they didn't look like they were

16   real.  I asked him about that.  And he said -- he said

17   that basically the numbers were just made up numbers,

18   that they didn't correspond to anything in particular,

19   that he had just made up some things and put on there;

20   and he said there weren't enough records available to

21   him or anybody else that they could have prepared an

22   accurate return anyway and that that return was just

23   simply made up numbers.

24   Q    And in your opinion, did Mr. Shipley have the

25   knowledge to classify Mr. Nguyen's expenditures as

 1    personal or business expenditures?

 2    A    I don't believe that he did based on what he said.

 3    Q    Did you talk to Mr. Shipley about the 90/10

 4    ownership split of National Direct Power Sports?

 5    A    I did.  He confirmed that that was the arrangement.

 6    Q    That's reflected in your report as well?

 7    A    It is.

 8    Q    Just a minute ago we talked about the different

 9    methods of proof used to reconstruct income.  What

10    method did you use in this case?

11    A    I used bank deposits and cash expenditures, the same

12    as the Government used.

13    Q    Why is your analysis different from the Government?

14    A    There are several things that cause differences in

15    different areas of my computation versus what the

16    Government had.  In the deposit side of things, they

17    have ignored, as we've heard testimony about this

18    morning, ignored the existence of the corporation

19    National Direct Power Sports; and I felt that that was

20    improper, that they should have recognized the existence

21    of that corporation and calculated income with that,

22    giving effect to that corporation.  So the deposits that

23    I included were split between the proprietorship prior

24    to the existence of the corporation and the corporation

25    after it came into effect.

1      On the expense side of things, there are some

2  differences -- well, let me back up to more differences

3  on the deposits.  There are some things that I used that

4  the Government did not use.  For example, there was a

5  $30,000 Certificate of Deposit that was purchased.

6  Traditionally, on the bank deposits computation, you

7  show that as a deposit like a bank account.  It is in

8  effect a depository instrument and then when it's

9  cashed, you show it as a non-income item.  And that's

10  what I did.  Probably it wouldn't have effected the

11  bottom line any; but it's more complete to show it that

12  way so that's how I handled it.  In 2006 the Government

13  did not show the deposits to I believe two personal bank

14  accounts of Mr. Nguyen's; and, again, I don't believe it

15  effected the computation very much because I think they

16  classified most of those as transfers and so it would

17  have been of no effect; but I included it for

18  completeness sake.  And so the deposits that I show will

19  be different from what they show to the extent of that.

20  That's the big differences on the deposit side.

21      On the expense side, as I said, the way that I did

22  that was by going through those items and not only

23  allowing Mr. Nguyen to go over it, but looking, you

24  know, giving it sort of a sanity check to see if it made

25  sense about how they were classified.  And not all

1    together unlike what the Government did.  They looked at

2    things to see what they thought and I did the same

3    thing.  And, of course, I had access to Mr. Nguyen as

4    well.  And so I classified expenses and I classified

5    those sometimes in different ways than the Government

6    did because of facts that I saw that they didn't know

7    about.  And also the fact that I gave effect to the

8    corporation, whereas the Government did not.

9    Q   Why did you think the corporation should be taken

10   into account?

11   A   It was pretty clear to me when I saw the way that

12   things were set up with the transactions that occurred

13   that the nature of the way business was done changed

14   pretty substantially in October, 2005, at the time that

15   the corporation was formed.  There were a lot of things

16   that happened at that time that lead me to believe that

17   they intended to do business in that way.  It was

18   confirmed by both Mr. Shipley and Mr. Nguyen that that

19   was their intention.

20   Q   What were some of those things that happened?

21   A   Well, some of what we've heard this morning.  The

22   corporation was formed.  The I-number was obtained.  An

23   S corporation election was filed.  They filed corporate

24   returns.  They opened or changed an existing bank

25   account to reflect a corporate name.  They -- there was

1    an infusion of capital into the entity in October, 2005.

2    The deposits show about $100,000, I believe, that went

3    into the corporate bank account either from Mr. Nguyen's

4    personal funds or from borrowed funds.  And then that

5    was followed in November of 2005 with approximately

6    another $200,000 that was put into that account.  They

7    had corporate checks printed up so they started writing

8    checks on corporate entity rather than what it had been.

9    Almost everything about the business started to change

10   at that time.  And it was very clear to me that there

11   was an intention to change the method of doing business

12   starting in October 2005.

13   Q    Exhibit 2 that we talked about this morning, is that

14   one of the things that indicated to you it was intended

15   to be incorporated?

16   A    Yes.  It's -- this is a Notice of Acceptance of S

17   Corporation Election Status.  It's effective October 10,

18   2005, which would have been -- that would have been the

19   date that the -- the filer of this, that being Mr.

20   Nguyen and Mr. Shipley, that's the date they selected as

21   a beginning date for that corporation.  It's also the

22   date that the corporation was formed.  And so you can

23   see from this that certainly there was an intention to

24   use that corporate name, otherwise why file and ask for

25   this.

1    Q    If you turn to Exhibit 4, can you tell us what that

2    is?

3    A    Those are the Articles of Incorporation of National

4    Direct Power Sports.

5    Q    And did you come to an understanding of how the

6    business operated after October of 2005?

7    A    Prior to October 2005 or after?

8    Q    Well, let's do prior first.

9    A    Prior to October of 2005, the business was operated

10   as a proprietorship owned by Mr. Nguyen.  Mr. Shipley

11   worked in that business; but he was essentially an

12   employee or contract labor.  I would say the latter

13   because he did not receive payroll checks so he was

14   working as contract labor.  And that was confirmed by

15   him that he worked for Mr. Nguyen, didn't own the

16   business at that point.  Starting in October, 2005,

17   Mr. Shipley said that he became an owner in the

18   business; and actually what had happened was the

19   business started to take off.  It became -- it was

20   apparent to them that the business was much better than

21   what they even anticipated it might be.  And so this

22   precipitated a new arrangement.  Mr. Nguyen was a full

23   time student at that point, didn't really have the time

24   to put into this business.  Mr. Shipley was devoting

25   full time to it.  So they formed the corporation.  And

1    that really probably drove the 90/10 split more than

2    anything else.  The fact that Mr. Shipley was able to

3    spend a lot more time in it, had to take more of the

4    responsibility.  Mr. Nguyen had the concept and had some

5    knowledge that allowed him to do some of the banking and

6    credit card activities, but he didn't have the time to

7    put into it.  So Mr. Shipley was handling a lot of the

8    time.  The statements have been made about who handled

9    what.  Really it's hard to say that either one of them

10   didn't do something pertaining to what the other one was

11   doing.  For example, internet sales.  Mr. Shipley

12   certainly was involved in that, a lot of the internet

13   sales generated complaints.  Some of the products that

14   were sold were damaged when they arrived and the phone

15   would ring about that.  Some of them were poor quality,

16   they came from China and were poorly made, and so they

17   had problems when they were delivered.  Not of any fault

18   of theirs but just the product wasn't that good.  And so

19   there were constant complaints.  In fact, it sounds like

20   somebody was on the phone almost all day every day

21   talking to people about complaints.  And so it wouldn't

22   be accurate to say that Mr. Shipley didn't do anything

23   about internet sales because I don't think they could

24   have had the internet sales without somebody there to

25   answer the phone about those.

1    Q   So when you took all of this into account and looked

2    at the numbers, based on your education, training and

3    experience, did you form an opinion as to the correct

4    amount of tax due and owing by Mr. Nguyen for 2005 and

5    2006?

6    A   Yes, I did.

7    Q   And what was that?  Are you looking at your report?

8    A   I'm looking at my report, Exhibit 5, Page 4 of that

9    report.  What you have on the screen is a copy of what

10   I'm looking at.

11   Q   So what did you determine was the corrected tax due

12   and owing?

13   A   For 2005, I showed actually they had lost money.

14   For 2006, the tax due and owing was $88,831.

15   Q   So let's walk through this chart.  And can you

16   describe what the different columns are?

17   A   Sure.  The first column that's labeled item is just

18   a column to put the descriptions of the various

19   categories of things that we'll be discussing.  Over

20   from that there are three columns for each 2005 and

21   2006.  The first of those columns says per IRS and that

22   reflects the computation numbers that the IRS came up

23   with based odd their investigation.  The 2005 corrected

24   column is what I came up with based on what I did.  The

25   differences of -- calculation of the difference between

1    those two.

2    Q    And the same thing for 2006?

3    A    Both years are the very same information, yes.

4    Q    Why do we worry about 2005 if we're only talking

5    about 2006 today?

6    A    Because there was a loss in 2005 that could be

7    carried forward to 2006; and without calculating what

8    that loss was for 2005, you couldn't accurately

9    calculate 2006.

10   Q    And are your numbers also reflected on Page 15 of

11   your report of Exhibit A?

12   A    Yes, they are.  That's a source document from which

13   this summary that you have on the screen was derived.

14   Q    If you look at Exhibit 8, is that where you got the

15   Government's numbers?

16   A    Yes, it is.

17   Q    Can you describe what Exhibit 8 is?

18   A    Exhibit 8 is the bank deposits and cash expenditures

19   computation that the Government calculated.

20   Q    So if we go down the lines, the first line is gross

21   deposits and what does this represent?

22   A    Those are the total deposits to the applicable bank

23   accounts for the period of time that we're reviewing.

24   Q    And your Schedule A reflects this is computed on

25   Schedule A-1.  Is this Page 16?

1   A   Yes, it is.   Schedule A-1 breaks out which bank

2   accounts those deposits were made to.   And in the case

3   of the Certificate of Deposit, it shows that as well.

4   Q   So the Government has $1,500,000 and extra.   And you

5   have a little more than 1 million.   What accounts for

6   that difference?

7   A   Most of that is because of the difference in the

8   associating deposits with the corporate return rather

9   than individual.   I split those deposits for 2005 out

10   between corporation and individual deposits.   Those

11   deposits that applied to the corporation after October

12   the 10th when it went into business, I made that

13   applicable to the corporation rather than to the

14   individual.   The ones before that, I made applicable to

15   him as a proprietorship.   And I've described earlier

16   there are some other small differences like the $30,000

17   CD is some difference there; and the deposits to bank

18   accounts that really don't make much difference but

19   still there were deposits, I include all those rather

20   than to leave them out.

21   Q   If you look at Page G00207, which is in Exhibit 8.

22   Can you describe what that is?

23   A   The numbers have hole punches in them.   Can you tell

24   me what appendix that is.

25   Q   It is B-1.

1    A    Okay.

2    Q    How do you -- where do these numbers come from on

3    B-1?

4    A    B-1 is a pivot table from an Excel spread sheet.

5    The Excel spread sheets from which this pivot table was

6    derived are the ones I used and the ones the Government

7    used.  This pivot table that we're looking at here

8    essentially summarizes those Excel spread sheets that

9    reflect the transactions in the account for each year.

10   Q    And did you go through all of the corresponding

11   spread sheets?

12   A    I did, yes.  I went through every spread sheet

13   pertaining to 2005 and 2006, yeah, every item.

14   Q    Did you determine some inaccuracies when you were

15   doing that?

16   A    Yes, yes, we did.

17   Q    So if you look at G00210.  And it has Nguyen Nguyen

18   Auto Group which we heard testimony about this morning.

19   Is that correct?

20   A    Yes.

21   Q    And do you know -- did you come to find out what

22   Nguyen Nguyen Auto Group was?

23   A    Nguyen Nguyen Auto Group is a business that's owned

24   by one of -- one or more of Mr. Nguyen's brothers.

25   Q    I know as an agent if you don't know what that money

1    is for specifically, do you give the benefit to the

2    Government or to the Defendant in your experience?

3    A    In a calculation like this you have, number one, you

4    have the burden to follow every reasonable lead.  So if

5    you have something like this, which is somewhat unusual,

6    it doesn't look like all the rest of the deposits in the

7    bank account.  As Mr. Hamor testified this morning, he

8    classified things based on how they looked.  This does

9    not look like the rest of the deposits, so right away

10   you have an obligation, that's a lead, you have an

11   obligation to follow that lead.  If you either don't

12   follow it or you can't follow it, then the training that

13   agents receive and the correct way to handle that is to

14   resolve it in the favor of the person under

15   investigation, not in the Government's favor.

16   Q    And if we flip back to Schedule A-1, which is Page

17   16.  That should be on the screen now in front of you.

18   Why did you not include those first three bank accounts

19   in the 2006 computation?

20   A    First bank account was closed in 2006.  And the

21   second two bank accounts were corporate accounts in

22   2006, so they're included on a separate computation of

23   the corporation's income.  And the one that we're

24   looking at here on Schedule A-1, this is an individual

25   computation, not a corporate one.

1    Q    And so back on your summary for 2006, you had quite

2    a large difference from the Government; is that correct?

3    A    In which year?

4    Q    2006?

5    A    Well, the Government ignored the corporation, so

6    whatever the corporation had, the Government didn't have

7    anything.  And so naturally there's quite a difference

8    because I attributed the operation in 2006 to the

9    corporation that came into existence in October, 2005.

10   Q    So then what's the next line down as we work down

11   your summary?

12   A    The next line down is cash expenditures.

13   Q    And Schedule A, which is Page 15, reflects that's

14   calculated on Schedule A-2; is that correct?

15   A    Schedule A-2 is a calculation of cash expenditures.

16   Q    Is that now on the screen in front of you?

17   A    Yes, it is.

18   Q    And can you tell us how you arrived at those

19   numbers?

20   A    The first line is business cost and expenses paid

21   with undeposited personal loans.  I interviewed -- let

22   me back up.  There were payments that came out of the

23   corporate bank account in 2006 to family members, or

24   what appeared to be family members, of Mr. Nguyen.

25   These, again, appeared to be unusual transactions that

1    required an explanation, again, a lead as I described

2    already.  So I inquired about those to find out the

3    nature of what they were.  And in the process of that

4    inquiry, I learned that there had been loans from family

5    members to Mr. Nguyen that were -- we're observing the

6    payments in 2006, we were seeing the back end of that

7    process.  We were seeing the repayments of those loans.

8    So we went through 2005 deposits and identified those

9    loans that were deposited to the account and then we

10   determined how many loans there were from the

11   repayments.  And the remainder is what you see here, the

12   one ten seven hundred, those were undeposited personal

13   loans used to pay for inventory used in the business.

14   Q    And then what is the proprietorship income deposited

15   directly?

16   A    The corporation started in October, 2005, as I

17   described.  There was a couple of -- there were a couple

18   of deposits after that time that were attributable to

19   the period when the business was operating as a

20   proprietorship.  In order for that to be included in the

21   proprietorship income, it had to be added back because

22   it was not in proprietorship deposits.  It went into the

23   corporation.  So I included those as if they're cash

24   expenditures.  And when you say cash expenditures, that

25   doesn't have to mean currency.  Cash can be an

1    expenditure not made from the bank accounts you're

2    dealing with.  So it can be in the form of an

3    instrument.  It doesn't have to be an actual currency

4    and that's what -- essentially that's what we have here.

5    These are deposits of money that was owed to the

6    proprietorship that was deposited to the corporate

7    account.

8    Q    If you look at Exhibit 8, what does it say under

9    description of evidence for cash expenditures?

10   A    It says see note below.

11   Q    And what does that note say?

12   A    It says: "Nguyen would not submit to an interview.

13   Therefore, the exact amount of the increase or decrease

14   in cash on hand could not be determined.  The bank

15   records do not indicate there was a significant increase

16   or decrease in cash on hand in 2005.  Nguyen's cash on

17   hand probably increased significantly due to the

18   structured out cash withdrawals at the end of the year.

19   Cash on hand increases are treated as currency

20   expenditures, according to the formula, and would

21   increase total deposits.  A conservative approach was

22   used since the cash on hand increase came from money

23   already in the bank account that was counted as income.

24   The increase in cash on hand was not added to total

25   deposits as it would be a wash with the same amount

1    added to checks written cash."

2    Q    Your experience with the IRS, what's the accuracy of

3    that note?

4    A    I don't subscribe to that method.  It ignores a lot

5    of problems that could be present.  You can't be sure

6    you have the right numbers using that theory.

7    Q    And did you come to learn that at times Mr. Nguyen

8    did pay suppliers in cash?

9    A    Yes, I did.

10   Q    And how did you learn that?

11   A    I learned it from talking to Mr. Nguyen.  He told me

12   that he did that.  And it was confirmed in the interview

13   with Mr. Shipley who said that he had also been told and

14   was, while not physically in the room, was present at

15   the place where money was delivered to the suppliers in

16   California from whom they obtained scooters for sale.

17   Q    And did you notice there were withdrawals of cash

18   from the deposits at certain times?

19   A    I did see that.

20   Q    And were there trips to California that corresponded

21   with those?

22   A    I spot checked some credit card records to see if

23   there were airplane fares purchased that would

24   correspond to cash withdrawals; and I did find that to

25   be present.  So there was some confirmation that the

1    story that I had heard was a true one.

2    Q    If we go back to our summary, what do we do after we

3    get those cash expenditures?  What's the next line?

4    A    Next line is just a calculated figure that

5    summarizes bank deposits and cash expenditures.

6    Essentially it summarizes all the funds that we're

7    dealing with in this process.

8    Q    And then what's the next line?

9    A    It's a line to remove non-income items that were

10   included in the deposits and cash expenditures.

11   Q    Schedule A, which is Page 15, reflects that this was

12   calculated.  Where does this say it was calculated?

13   A    It's calculated on Schedule A-3.

14   Q    And if you look at Page 18, this Schedule A-3?

15   A    It is.

16   Q    Do you have -- it lists nothing for 2006.  Is that

17   correct?

18   A    That's correct.

19   Q    Should it list something?

20   A    Yes.  The version that got put into this report was

21   an incorrect version.  There are 2006 items.  I've since

22   provided that to you.  This is one that was inserted

23   that was the incorrect spread sheet.  It was before the

24   2006 numbers were inserted.  The one you have on the

25   screen now includes those numbers.

1    MS. THOMPSON:  May I approach, Your Honor.

2  Q   So how did you arrive at the numbers for the

3  non-income deposits?

4  A   By going through the analysis, the spread sheets, of

5  the deposits to the various bank accounts.

6  Q   And it has again listed at the bottom -- what's the

7  next to the last line?

8  A   Undeposited personal loan proceeds.  We've talked

9  about that before in terms of the effect on this

10  computation.  And since these are funds that are

11  involved in the computation but they're not income, they

12  don't represent income, then they're included on this

13  schedule.

14  Q   Okay.  What's the next line?  Gross receipts?  Is

15  that correct?

16  A   That's, again, a calculated figure.  It's the total

17  deposits and cash expenditures less non-income items.

18  Q   And then it looks like we subtract out the business

19  cost and expenses; is that correct?

20  A   That's correct, yes.

21  Q   The Schedule A, Page 15, where does it say that's

22  calculated?

23  A   Schedule A-4?  I think that actually is --

24  Q   We just talked about A-4; is that correct?

25  A   I think that should have been A-5.

1    Q    Is A-5 Page 20?

2    A    I believe it's Page 19.

3    Q    It's on the screen now?

4    A    That's correct.  This is a summary of the business

5    expenses and costs paid from the bank accounts that are

6    listed, paid with credit cards, paid with cash that we

7    just described.  And the one item on there that hasn't

8    been really discussed yet is paid with corporate funds.

9    We did talk about some deposits to the corporate account

10   that were made after the corporation came into

11   existence.  And, likewise, there were some expenditures

12   from the corporate account that represent payments for

13   things owed by the proprietorship before the

14   proprietorship ceased.  And that's what the 24764491 is

15   where it says paid with corporate funds.

16   Q    What is the ending inventory as of October 9, 2005?

17   Why do we subtract that out?

18   A    Because when the proprietorship ceased and the

19   corporation started, there were items on hand that had

20   not been sold.  And since we picked up all those checks

21   that -- or payments that were made to purchase those

22   items, yet these things are still on hand, we back those

23   out so that it recognizes that we still have that asset.

24   It has not been expended or sold; but, rather, we still

25   have it.  So we reduce it by the ending inventory

1    balance.  And this inventory I determined from talking

2    to Mr. Nguyen, from talking to Mr. Shipley, and from

3    examining tax returns they filed, and this number seemed

4    to be consistent with what was shown by those interviews

5    and by those tax returns.

6    Q    And Mr. Shipley gave you a similar number that

7    Mr. Nguyen gave you?

8    A    I believe Mr. Shipley thought it was around 20,000.

9    Q    If we go back to our summary.  What's the next line

10   after the business cost and expenses -- well, why was

11   nothing listed for 2006?

12   A    Because the business was conducted through the

13   corporation in 2006 and the business expenses were paid

14   through that entity and it's included on a separate

15   computation.

16   Q    And then what are long term capital gains?

17   A    They're only present in 2006.  And what happens on

18   an S corporation, when individuals take distributions

19   from an S corporation, those distributions don't

20   necessarily constitute income when they're taken.  You

21   have to determine what the person's basis in their stock

22   is to determine whether they're taxable or not taxable.

23   And if you exceed your basis in your stock, then the

24   distributions you take are income to that extent, to the

25   extent that you've exceeded the basis in your stock.

1    And that's what this number is.  This is the amount by

2    which his distributions exceeded the basis of his stock.

3    Q   Is your -- is that computed on Page 20 of your

4    report?

5    A   Yes, it is.

6    Q   So the inventory we just talked about in 2005; is

7    that correct?

8    A   Right.  We start with no basis.  On 10-9 the

9    corporation didn't exist, so no basis.  You started with

10   zero.  This is essentially a running account of the

11   things that effected his basis in his stock.  The first

12   item you see is he took inventory that he owned in the

13   proprietorship and he contributed that to the

14   corporation to the extent of $25,000.  He had a Toyota

15   pickup that had been bought in the proprietorship, he

16   contributed that as well.  We identified contributions

17   that he made by analyzing the bank accounts.  So the

18   next two items there show capital contributions

19   deposited to accounts 3836 and 5729.  Identified those

20   by analyzing the bank account.  And then the next items

21   showed the distributions made in 2005.  There's five

22   items there listed.  Some of those are distributions

23   from the corporate bank accounts determined by analyzing

24   the accounts.  Some of them are amounts paid by credit

25   cards paid by the corporation.  So if those credit cards

1    were for his personal benefit, and the amounts there are

2    not really large, but they should there be, so those are

3    included as reduction of his basis in his stock.  And

4    then the last item that's shown is his share of the

5    corporation's ordinary loss for 2005 that should have

6    been shown on the Schedule K-1 had the corporate return

7    been prepared correctly.

8    Q    Then you do the same thing for 2006?

9    A    Exactly the same process.

10   Q    So if you have that negative number that's at the

11   end of 2006, what does that mean?

12   A    That means his withdrawals exceeded his basis by

13   that much.

14   Q    And that's, again, reflected on your summary?

15   A    It is.  A person who takes withdrawals in excess of

16   the basis isn't getting around the tax.  The tax is

17   still gonna be levied on those withdrawals,

18   distributions.  It just changes the nature of how the

19   income is taxed.  And so here it's taxed as long term

20   capital gain because his distributions exceeded the

21   basis by this amount.

22   Q    The next line.  What do we do next?

23   A    The distributed share of the S corporation, income

24   loss, and that comes from a separate computation of the

25   income or loss of that entity for 2005 and 2006.  So we

1    can talk about that when we get to; but that's where

2    that comes from.

3    Q    If you look at Page 21, is that where you computed

4    the corporate income or loss?

5    A    Yes, it is.

6    Q    So how did you work through this?

7    A    This computation is done the exact same way that the

8    bank deposits and cash expenditure computations were

9    done for the individual.  The difference is here we're

10   using only the corporate accounts starting October 10th,

11   2005, and all of 2006.  And the theory, the computation,

12   was handled exactly the same way.  You see some of the

13   same items listed there.  Not as many because there

14   aren't as many issues with the corporation; but the

15   theory is exactly the same.

16   Q    And on the far right, that lists the schedules where

17   these are broken out; is that correct?

18   A    It does.

19   Q    The last distributive share.  Do you see that?

20   A    Yes.

21   Q    How did you arrive at Mark Shipley 90%, Dinh Nguyen

22   10%?

23   A    It's what was reflected on the returns for the

24   corporation that were filed and it's what both of them

25   said the relative ownership of each was.

1    Q    If you look at Exhibit 7-A, B and C in Defendant's

2    notebook.  What is that?  What are those?

3    A    7-A is 2006 form 1120 S for National Direct Power

4    Sports Incorporated.  Schedule B is a 2006 individual

5    return for Mr. Nguyen.  And Schedule C is a 2006 return

6    for Mr. Shipley.

7    Q    And do those reflect that they attempted to do it

8    90/10?

9    A    That's what it appears to be, yes.

10    Q    In your experience as an IRS agent, does it matter

11    how much work one person puts in versus another when you

12    determine how much percentage they get for the income?

13    A    Stock ownership in a company has no -- the amount of

14    work that someone is going to do has no bearing on that.

15    That's something that's worked out between the parties

16    when the corporation is formed.  And they might consider

17    that.  They might look at that; but it's not a

18    determining factor.  I think it probably was considered

19    to some extent here because Mr. Shipley said that the

20    reason he owned 90% of the stock was because he was

21    working full time in the business and Mr. Nguyen was

22    only working a little bit when he could because he was a

23    student.  And so it seemed appropriate to them that he

24    would own the greater share of the entity.  In the event

25    that it became worth something some day, it was felt by

1    them that he should own the lion's share of that.

2    Q    In your experience as an IRS agent, is it the intent

3    of the parties that matter or is it the form that

4    matters?

5    A    Both matter.

6    Q    And why is that?

7    A    Because if you look at one in isolation from the

8    other, you don't have the whole picture.  If you just

9    see the form of something but you don't know the intent,

10   you don't know the whole thing.  And if you only see the

11   other side, you don't know it all either.  So you'd like

12   to know both sides of that, both the form and the

13   intent.

14   Q    And in your experience, did you form an opinion as

15   to what -- using your experience, did you form an

16   opinion as to whether Mr. Nguyen and Mr. Shipley had the

17   sophistication to understand the 90/10% split?

18   A    I think they understood that it was going to

19   represent the amount of effort that Mr. Shipley was

20   going to apply to it versus Mr. Nguyen.  In terms of did

21   they understand the tax ramifications and what this

22   might mean going forward, I would say they did not know

23   that.  In fact, I would have been surprised had they

24   known it because most people don't know.

25   Q    This morning did you hear Agent Hamor testify

1    that -- about disproportionate distributions?

2    A   I did.

3    Q   And did you hear him testify that the IRS could

4    disregard the S corp status if there were

5    disproportionate distributions?

6    A   I heard that.

7    Q   And does that happen every time there are

8    disproportionate distributions?

9    A   It does not.  That's a decision that has to be made

10   based on the facts.  It's not automatic.

11   Q   So what did Mr. Nguyen -- what was Mr. Nguyen's

12   business income for 2005 on Schedule B?

13   A   Do you know what page that's on?

14   Q   21.  The last line, what does that say Mr. Nguyen's

15   portion is?

16   A   Mr. Nguyen's share of the ordinary income or loss

17   for 2005, there was a loss.  He has 10% of that so his

18   share was 13,659.05.  And for 2006 there was ordinary

19   income and his share of that was $72,706.22.

20   Q   If we go back to your summary.  Where is this

21   listed?  Where are those numbers reflected on your

22   summary?

23   A   It's listed where the line that says add

24   distributive share of S corporation income or loss.

25   Q   And then the next line, what is that?

1   A   It's labeled as less net operating loss carry over.

2   If you look at the calculations for 2005, you look at

3   the total income line.  You see that his net loss from

4   his business operations that year, 38,410.59, that loss

5   is allowed to be carried forward and it is carried

6   forward in 2006 as a net operating loss carried forward.

7   Q   What does that give you for his total income for

8   2006?

9   A   For 2006, his total income was a negative

10  $38,410.59.

11  Q   Then it looks like the IRS has some self-employment

12  tax.  Why did you not include the self-employment tax

13  deduction?

14  A   Because he had a loss.  There is no self-employment

15  tax on a loss.

16  Q   Would you have self-employment tax on a corporation?

17  A   No.  The corporate entity, the items he received

18  from there are not subject to self-employment tax.

19  There's no self-employment tax on capital gains or S

20  corporation flow-throughs reported on Schedule E.

21  Q   Then you both agree on the tuition and fees;

22  correct?

23  A   Correct.

24  Q   And then you have the adjusted gross income?

25  A   It's a calculated figure.

1    Q    And then more deductions that you both agree on; is

2    that correct?

3    A    That's correct.  We agree.

4    Q    And then you have the corrected taxable income?

5    A    A calculated figure.

6    Q    Go through the self-employment again; correct?

7    A    Again, they have added self-employment tax in

8    because they calculated income on Schedule C for both

9    years.  Schedule C net income is subject to self-

10   employment tax so that's what you're seeing in the

11   Government's calculation.  The Schedule C calculation

12   that I did was a loss so there is no self-employment tax

13   and that's why there's a difference there.

14   Q    So what was your final corrected tax income due and

15   owing for 2006?

16   A    A tax due and owing of $88,831.

17   Q    This morning you heard Agent Hamor testify about

18   checks paid out to Lisa Greenwood.  Do you remember that

19   testimony?

20   A    Yes, I do.

21   Q    And how did you classify those checks?

22   A    Classified those as nondeductible personal

23   expenditures.

24   Q    So you agreed with the Government that those were

25   personal?

1    A    I do.

2    Q    And you also heard Agent Hamor testify about cash

3    withdrawals at the end of 2006.  Did you talk to

4    Mr. Nguyen about what these were?

5    A    I did.

6    Q    And did you also talk to Mr. Shipley about what

7    these were?

8    A    Yes, to some extent.  He didn't know as much as

9    Mr. Nguyen, but I did ask.

10   Q    And what was your understanding of what those

11   represented?

12   A    My understanding is that near the end of 2006, the

13   distributors that they had been buying scooters from in

14   California, these are Chinese made scooters and the

15   distributors are also individuals of Chinese descent.

16   These individuals proposed that if they could be paid in

17   cash that there would be a discount for doing so.  And

18   that discount could range from 3 to 5 or 6% on the

19   purchase price of the inventory.  And so many times that

20   was done.  There was cash withdrawn or cash was taken

21   from loans or whatever source was available and was used

22   to pay for scooters that had been purchased.  That money

23   was hand-delivered to the suppliers in either California

24   or sometimes in Las Vegas.  There are trips to Las Vegas

25   where that occurred as well apparently.

1    Q    If you look at Exhibit 9, can you tell me what that

2    is?

3    A    Those are deposit receipts that pertain to the

4    Prairie State Bank account of Mark Shipley.

5    Q    And these are just a sample of Mr. Shipley's bank

6    accounts; is that correct?

7    A    They are.  I've reviewed all of the bank account

8    records that were furnished to us; but, yes, these are a

9    sample.

10   Q    Are these representative of what the entire --

11   A    Yes.  They look very typical of all the ones I saw.

12   Q    Can you kind of describe what you notice?  Does

13   anything stand out to you about this bank account?

14   A    Well, the first thing that you see is that almost

15   every deposit was cash.  There may be an exception or

16   two; but mostly it's cash.  And the deposits are not

17   very significant.  There's not much there in terms of

18   how much was deposited.  And from reviewing the bank

19   statements, it appears that the amounts of deposits are

20   geared to direct withdrawals from that account for

21   things like loan payments that had to be paid.  As I

22   reviewed the bank account, I saw almost nothing that

23   would indicate Mr. Shipley was paying his personal

24   living expenses out of this bank account.  There was

25   nothing there to indicate that.  In fact, if you saw

1   this, you wouldn't know how he survived.

2   Q   Did you see any paychecks from the corporation

3   issued to Mr. Shipley and his bank accounts?

4   A   Didn't see anything that looked like paychecks.  I

5   did see a few checks to him; but they didn't have the

6   qualities that look like they would be a salary.

7   Q   So, in your experience, does this indicate that he

8   wasn't getting paid?

9   A   It indicates to me he's probably getting paid in

10  cash.

11  Q   And these bank accounts, are they usual with

12  somebody who deals primarily in cash?

13  A   That's what I saw -- first time I saw it, that's the

14  first thing I thought.

15  Q   This morning did you hear Mr. Thompson ask Mr. Hamor

16  about the profit margin between the two years?

17  A   I did.

18  Q   And in your experience, is it unusual for a profit

19  margin to jump that high between years?

20  A   It's unusual for it to jump that much, and the

21  profit margin itself for 2006, 30 something percent, is

22  pretty unusual.  There are not very many businesses that

23  can operate with that kind of profit margin.

24  Q   What does that indicate to you?

25  A   It indicates there may be some error in the

1    calculation; otherwise, that margin wouldn't be so high.

2         MS. THOMPSON:  I don't have any further

3    questions, Your Honor.

4         THE COURT:  Thank you, Ms. Thompson.  Do you

5    want to take a recess, Mr. Lind?

6         MR. LIND:  That's fine, Your Honor.  I can

7    proceed if the Court's ready.

8         THE COURT:  We'll take a short recess.

9              (Recess.)

10                    **CROSS EXAMINATION**

11   BY MR. LIND:

12   Q   Mr. McDaniel, you talked about you consider Shipley

13   an employee before October of '05.

14   A   Probably not in the classical sense of that word

15   because I don't believe there was any withholding.  I

16   think he was paid more like a contractor than he was an

17   employee.  More like a self-employed person.

18   Q   But, of course, in reviewing his tax forms, you know

19   that he filed a Schedule C as a sole proprietorship for

20   the brick and mortar business?

21   A   That's the way you report contract labor.

22   Q   Uh-huh.  And he claimed, of course, when they

23   incorporated BN Scooters, back when they dissolved it,

24   he was listed as a stockholder; correct?

25   A   I believe that's what was said this morning, yes.

1   Q   And he was -- he's listed as one of the stockholder

2   in the dissolution?

3   A   That's the corporation.  That's not the

4   proprietorship.

5   Q   But the corporation being Scooters Inc.?

6   A   Never did business.

7   Q   Well, that's what you say; but they filed a tax

8   return.  I mean, Shipley files a tax return.  And they

9   have Articles of Incorporation?

10  A   He filed an individual tax return.  They didn't file

11  a corporate tax return, which is what they would have

12  done had they been in business.

13  Q   Bingo, they would have.  And you're saying you can

14  ignore that corporation because of the way they acted;

15  correct?

16  A   They never did anything to go into business.  That's

17  the reason I said you could ignore it and they did

18  ignore it.  In fact, they said at the end of 2004 they

19  had ceased business.

20  Q   And you say you can ignore the fact that they

21  incorporated the business because of the way they acted;

22  correct?

23  A   Not just how they acted; but the documents

24  themselves show that -- the form says they ceased

25  operation end of 2004.

1    Q    Actually the form -- they filed the last annual

2    report in 2006; correct?

3    A    But the document says it ceased business at the end

4    of 2004.

5    Q    And it was filed in 2006?

6    A    It was filed late, most likely in response to an

7    inquiry from the state.

8    Q    Uh-huh.  And you talked about changes.  You say

9    inquires from the state.  There were inquiries in this

10   business and changes in which you say occurred about

11   October, 2005.  There were changes around that time.  A

12   lot of 'em you talked about; correct?

13   A    There were a number, yes.

14   Q    Including the legal troubles this business was in

15   and Mr. Nguyen and Mr. Shipley with the DA's office?

16   A    I don't know when that started.

17   Q    Okay.  But you know that there was trouble and in

18   October, 2005, is when the DA's office, the consumer

19   fraud division, stepped in?

20   A    I don't know that.

21   Q    You didn't know that at that time?

22   A    I don't know that.

23   Q    That information wasn't given to you?

24   A    No, it was not.

25   Q    Have you seen, in your experience, when the consumer

1  fraud division steps in that people change the name of

2  their business and continue?

3  A   I don't know that I've seen consumer fraud division

4  step in so I don't know that I can answer that.

5  Q   Would it surprise you that if the consumer fraud

6  division stepped in and said we're going to file a

7  restraint order on you, you can't do business any more

8  BN Scooters, that somebody might then change their name?

9  A   I suppose that's one possibility.

10  Q   It's just a coincidence it happened at the same

11  time?

12  A   I don't know.  You're asking me to speculate about

13  something that I don't know anything about.

14  Q   Nobody showed you the injunction?

15  A   I don't think I've seen the injunction.

16  Q   In your discussions with Mr. Nguyen, he never told

17  you that at that time we were kind of in trouble with

18  the DA so we decided to change names?

19  A   No, he never said that.

20  Q   He never said that.  But you can see that in

21  October, the consumer fraud division stepped in, the

22  State of Kansas vs. Dinh Nguyen and Mark Shipley,

23  individually and as BN Scooters Incorporated?

24  A   I see that.

25  Q   Okay.  So a lot of changes happened around October,

124

1    2005.  You say they happened because they wanted to

2    become an S corporation?

3    A    They did become an S corporation.

4    Q    Okay.  They filed paperwork just like they had done

5    back in 2004 when BN Scooters incorporated?

6    A    No.

7    Q    They filed paperwork with the Secretary of State the

8    same way --

9    A    But there are many other things that happened.

10   That's not all that happened in October, 2005.

11   Q    Yeah, but you have to agree with me, they did file

12   just like they filed the year before?

13   A    They filed, but not just like it.

14   Q    Okay.  Now, this loss that you say you carry over

15   from 2005 to 2006, you have to have the $172,000 in

16   unreported cash expenditures to get that loss, don't

17   you?

18   A    I don't know what the number is, but it's in that

19   calculation.  You can see that.

20   Q    But you have to have that?  That was unreported cash

21   expenditures to get a loss?

22   A    The cash expenditures certainly contributed to that,

23   absolutely.

24   Q    Without the cash expenditures, there's no loss?

25   A    Well, I didn't try to calculate it that way because

125

1    I believe the cash expenditures occurred.  There

2    wouldn't have been a reason to calculate something based

3    on what I did not believe happened.

4    Q    Those are loans to the Defendant by family you said?

5    A    I believe they are.

6    Q    Who?  Which family members?

7    A    Well, if you can look in 2006, look at the payments,

8    you can see who some of them are.  You can see cashier's

9    checks going back to them.

10   Q    In 2005, who gave him cash money that's unreported?

11   That's what I'm asking.

12   A    If you'll give me the spread sheets, I'll point out

13   those numbers to you.  I can't recall the exact names.

14   They're all -- most of them have last name of Nguyen.

15   Q    And, again, you have to rely on the Defendant's word

16   for that?

17   A    The Defendant is the one who told me that, yes.

18   Q    Okay.  And, again, he's pulling money out at the end

19   of 2006.  This business really kind of ceased at the

20   beginning of 2007, didn't it?  Because of all the

21   trouble with the DA's office?

22   A    It ceased.  I don't know if that's what caused it or

23   if it was a combination of factors.  I think there were

24   some other factors, too.  The scooter business in

25   general, I think, went down in 2007.

1    Q    Well, it went to his family.   They continued it.   So
2    did he dump a bad business on his family?
3    A    I don't know that he dumped anything on them.   I
4    think they stayed in the scooter business; but I don't
5    know that it had much to do with him.
6    Q    So the scooter business is going down, he's gonna
7    shut it down, but his brothers at Nguyen Nguyen Auto and
8    then his other brother who changed the name to All State
9    or All Star decided Dinh is not a very good businessman,
10   he only made half a million dollars, I'm going to go
11   ahead and take over?
12   A    And the question on that is what?
13   Q    Would a family -- is that reasonable that they would
14   do that?
15   A    Well, I don't know.   You're asking me to guess what
16   his family members think.   I have no idea what they
17   thought.
18   Q    You guessed that they loaned him money?
19   A    I didn't --
20   Q    What physical evidence do you have?
21   A    He paid them back, so there's not -- that's not a
22   guess about --
23   Q    He gave money to his family, that's right.   You saw
24   that in the bank records; right?
25   A    That's as reasonable of an explanation as saying

1    that it was income.

2    Q   Do you have documents to prove he paid them back?

3    In other words, that they loaned him the money.  You

4    have documents showing they loaned him money?

5    A   No.  It was in cash.  That's what I said.

6    Q   I think you stated on direct that Mr. Shipley said

7    that he had been with Dinh when he paid cash for things.

8    That's not really what he said, is it?  Let's talk about

9    the statement Shipley made to you.  It's an exhibit.

10   You typed that up you said?

11   A   Uh-huh, based on what he said and notes I took

12   during that interview, as well as the other person who

13   was there.

14   Q   And Mr. Shipley told you some interesting things.

15   He said that he never looked at bank statements because

16   Mr. Nguyen did that; correct?

17   A   Uh-huh.

18   Q   He never looked at invoices for scooters because

19   Mr. Nguyen did that?

20   A   Uh-huh.

21   Q   Is that a yes?

22   A   Yes, he did, yes.

23   Q   He said he didn't even know how much the scooters

24   cost?

25   A   I believe he went on to say he sometimes inquired

1    when he needed to to negotiate a sales price; but as a

2    general rule, he said the stated price was what they got

3    for it, he didn't need to know what they cost.

4    Q    Right.  He had no idea how much they cost, the

5    business he owned 90% of; correct?

6    A    Both of those statements you made are true.

7    Q    And when somebody wanted to haggle price, he had to

8    ask Mr. Nguyen what he could sell it for?

9    A    Right.  I believe what he said was that Mr. Nguyen

10   handled that part of the business, that that was not his

11   role to play in that business.

12   Q    I think he said when that occurred, it was my

13   practice to ask Dinh about the minimum sale price for

14   the particular scooter before I finalized the sale since

15   Dinh knew more about the cost of the scooters than I

16   did?

17   A    That's right.  I believe Mr. Nguyen dealt with the

18   suppliers and I believe that would be accurate.

19   Q    So Mr. Shipley really didn't know anything about the

20   business?

21   A    He was there every day running it and handling

22   complaints, dealing with repairs, dealing with walk-in

23   customers.  He knew a lot about the business; but it was

24   just certain facets of the business that he didn't know

25   very much about, which is not unusual in a small

1    business.

2    Q    Like how much the scooter cost that he's trying to

3    sell?

4    A    Well, you don't need to know that.  If you're going

5    to sell at a listed price, it doesn't really matter to

6    you what it cost.

7    Q    You need to know if people want to come in and get a

8    bargain and haggle?

9    A    That's when he said he would ask them when that

10   happened.  Apparently, it wasn't very often.  He said it

11   typically sold at the listed price.

12   Q    Mr. Nguyen took a distribution of, according to your

13   records, about $568,000.  You called it a distribution

14   in 2006?

15   A    Yes.

16   Q    He had no income from the corporation?

17   A    Yes, he did.  He had the capital gain of five

18   hundred and something thousand dollars.

19   Q    He didn't have wages.  I'm sorry.  I was incorrect.

20   A    He didn't have wages, no.

21   Q    He had no wages.  So he worked in the store, he

22   worked in the internet sales, he took no wages?

23   A    He didn't take a salary.

24   Q    No wages, in fact, salary or hourly?

25   A    No.  And neither did Mr. Shipley.

1    Q    Somebody who doesn't take wages but takes the money

2    in the end, that's consistent with a sole

3    proprietorship, too, isn't it?

4    A    Not necessarily.  A lot of small businesses operate

5    in ways like that.  It's not as unusual as you might

6    think.

7    Q    S corporations require you to have wages if you're

8    going to take a high distribution?

9    A    No, they don't.  That's not true.  They require you

10   to take a reasonable salary for the service you provide.

11   Q    And is zero a reasonable salary when you take a

12   $568,000 distribution?

13   A    I don't know.  I'm not sure what all duties

14   Mr. Nguyen would have provided and I don't know what the

15   fair market value of those would have been.  Nor do I

16   know what Mr. Shipley's would have been, as far as that

17   goes.

18   Q    Now, when the corporation did dissolve -- it

19   dissolved at some point; correct?

20   A    I believe it did.

21   Q    You don't know?

22   A    I didn't look into 2007.  It wasn't an issue in the

23   case so I didn't try to pursue it.

24   Q    I'm just curious as to how much money Shipley got at

25   the end of the dissolution of the corporation?

1   A    I don't know the answer to that.

2   Q    It's zero; right?

3   A    Well, I don't know.

4   Q    You never looked?

5   A    No, I didn't look into 2007.  That's what I just

6   said.

7   Q    Nowhere on any return did the Defendant list any

8   loans he made to the corporation; correct?

9   A    You wouldn't list it on a return.

10  Q    Well, there's a spot, I believe, on the 1120 S where

11  he could have listed if he made a loan to the

12  corporation?

13  A    He could have; but that schedule is not required on

14  this S corporation.

15  Q    But he didn't do it; correct?

16  A    It's not on there and it's not required to be there.

17  Q    Are you required -- in your time in the IRS, if

18  somebody came to you and said, oh, I got all these cash

19  advances from loans from family but I got no record of

20  it, did you routinely just say, you know what, today is

21  your lucky day because I'm a good guy, I'm just going to

22  say fine?

23  A    No, that's not what I did.

24  Q    What evidence do you have here, physical evidence

25  that you have, that money was loaned to the Defendant by

1    his family?

2    A    The repayments support the fact that there were

3    monies coming from them.  That's consistent with that

4    loan.

5    Q    You call them repayments.  Actually, the evidence

6    only shows that there are payments.

7    A    There were payments.  You can characterize those in

8    other ways if you choose.  It appears to me that those

9    probably are loan repayments.

10   Q    And what evidence do you have of that besides the

11   Defendant's statements?

12   A    I don't have notes.  It was in cash, so there's very

13   little evidence that you could have for that.

14   Q    What evidence do you have besides the Defendant's

15   statements?

16   A    That's what I have.

17              MR. LIND:  Thank you.  May I have a moment,

18   Your Honor?

19              THE COURT:  Yes.

20                     (Off-the-record.)

21              MR. LIND:  Nothing further, Your Honor.

22              THE COURT:  Redirect, please.

23              MS. THOMPSON:  We have nothing further, Your

24   Honor.

25              THE COURT:  All right.  You may step down,

 1    sir.  Call your next witness if you have any other

 2    witnesses.

 3              MS. THOMPSON:  We don't have any other

 4    witnesses, Your Honor.

 5              THE COURT:  Any rebuttal?

 6              MR. LIND:  No, Your Honor.

 7              THE COURT:  All right.  I'll take this under

 8    advisement.  Unless you all want to make some argument.

 9              MR. LIND:  I don't think it's necessary, Your

10    Honor, unless the Court wants it.  If there's a specific

11    issue --

12              THE COURT:  Here's my problem.  I already have

13    a problem about this witness's testimony in terms of

14    what information he got from the Defendant.  I've told

15    you that and you can research that and write me a letter

16    or whatever you want to.

17              MR. LIND:  And we will, Your Honor.

18              THE COURT:  Am I -- is it your respective

19    positions that I am either to take the Government's

20    figure or the Defendant's figure?

21              MR. LIND:  I think, as the Court, you can take

22    any figure the Court determines to be correct.

23              THE COURT:  No.  My point is, I'm not sure I

24    have the information or the ability to elect any other

25    figure.  That's the problem.

1          MR. THOMPSON:  It's not our position that you

2     have to do that.  I can appreciate where the Court's

3     coming from and I think that maybe when we address your

4     issue about the relevance of the information gleaned

5     from Mr. Nguyen we can tie that to some numbers that if

6     the Court were to ignore that or hold that it was --

7     that it were admissible, it might be helpful.

8          THE COURT:  I'll consider anything you want to

9     submit.  There are a lot of things about this case that

10    bother me; but I'll deal with those at the appropriate

11    time, including credibility of this last witness.  You

12    may as well know that.

13         MR. THOMPSON:  Okay.

14         THE COURT:  I don't find it very credible.

15    All right.  I'll take it under advisement.  You can have

16    basically whatever time you want to submit information

17    to me.  But let's try to make it within about 30 days.

18    You all can agree on a time.  I'll be here for a couple

19    weeks and then I'll be gone for a couple weeks.  Taking

20    advantage of senior status.  But I'd like to get this

21    over with.  I'm sure Mr. Nguyen would like to get it

22    over with.  And I appreciate that.  All right.  Thank

23    you.

24                     (Adjourned at 2:35 p.m.)

25

1

2                        C E R T I F I C A T E

3

4          I, Cindy L. Schwemmer, United States Court

5     Reporter in and for the District of Kansas, do hereby

6     certify:

7               That the above and foregoing proceedings were

8     taken by me at said time and place in stenotype;

9               That thereafter said proceedings were

10    transcribed under my direction and supervision by means

11    of computer-aided transcription, and that the above

12    and foregoing constitutes a full, true and correct

13    transcript of said proceedings;

14              That I am a disinterested person to the said

15    action.

16              IN WITNESS WHEREOF, I hereto set my electronic

17    signature on this the 19th day of August, 2014.

18

19

20

21                             s/ Cindy L. Schwemmer

22                             Cindy L. Schwemmer, RPR, FCRR

23                             United States Court Reporter

24

25