**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action |
| | ) | |
| v. | ) | No. 12-10219-01-MLB |
| | ) | |
| DINH NGUYEN, | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S POST-SENTENCING HEARING MEMORANDUM**

**INTRODUCTION**

*1. The Significance of Tax Loss Calculation*

At the close of presentation of evidence on the sentencing hearing with respect to tax loss, the Court granted the parties the opportunity to brief the issues further. Mr. Nguyen and his counsel are appreciative of that opportunity. The parties also eschewed closing statements, thus this memorandum seeks to summarize the state of the evidence following the hearing.

This case involves, of course, a plea. Mr. Nguyen pled guilty to the offense charged and has not sought to retreat from his plea. The question of loss, as in most "white collar" or criminal cases is important as it relates to the advisory sentencing guidelines. Thus while the amount of tax loss was not a determinative element as to the plea to violating 26 U.S.C. § 7201, it assumes separate and independent significance in the context of sentencing.

The determination of loss, and any concomitant order of restitution also carries with it another, perhaps even more significant, consequence. The IRS may use the restitution order as the

1

basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4). The defendant then does not have the right to challenge the amount of the assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor the timely payment thereunder would preclude the IRS from an assessment, including levy and distraint under 26 U.S.C. § 6331.

Given these considerations, it was important to Defendant that the court approved the plea agreement which reserved determination of tax loss to the court.

2. *Nature of the Evidence Presented at the Hearing*

At the beginning of testimony from the defense expert, Mr. Dale McDaniel, the Court raised a question as to the nature of information to the extent it appeared to be exculpatory based on inadmissible hearsay from the defendant and one as to the impact on witness credibility. It referenced precedent from *United States v. Savaiano*, 843 F.2d 1280 (10th Cir. 1988) in this regard. The defense seeks to address the Court's concern as it relates to three subjects: admissibility, credibility and reliability. The first is whether the information relied on by Mr. McDaniel was admissible. Even if it was, of course, the Court also retains complete discretion to determine reliability and/or credibility.

  a. <u>*Savaiano* does not preclude admission of Mr. McDaniel's testimony</u>

In *Savaiano,* the defendant's counsel unsuccessfully sought to introduce into evidence by way of cross-examination the comment of a law enforcement officer and use it to establish the substantive defenses of withdrawal from the conspiracy and abandonment of the attempt to manufacture. The district court in that conspiracy trial was concerned that the statement would incriminate a co-defendant without permitting cross-examination of Savaiano. The Tenth Circuit held the comments are inadmissible hearsay, and an improper attempt to admit Officer Gilchrist's

version of Savaiano's comments to establish the truth of the matters contained in those comments, without subjecting Savaiano himself to cross-examination.

In this case, the defense approached the sentencing hearing, as did the government, by attempting to use a single witness to summarize information gleaned from numerous sources. Both the government witness, Agent Hamor, and the defense witness relied on statements of third parties, wide ranging documents and professional opinions as to proper tax loss calculations. In taking this approach, the defense approached the process based on the Sentencing Guidelines which provide that the Federal Rules of Evidence are inapplicable at sentencing. *See* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information … which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.")

**The defense understands full well that the reliability and credibility of the testimony is within the province of the court.** Those are somewhat different questions than admissibility, however.

    b. <u>Reliability and Credibility of the evidence</u>

This memorandum seeks to compare the specific analytical approach and methodology used by both witnesses. To the extent questions of credibility of Mr. McDaniel arise out information provided by Mr. Nguyen whom the court held had not been available to the government or the probation office, then an element of unfairness was involved. If that infects Mr.

3

McDaniel's credibility on his analysis and technical considerations, it occurred only because defense counsel directed the collection of information.

If one were to question why Mr. Nguyen did not discuss the facts of the case with the probation officer, the defense did not understand that inquiry was made into the facts of the case in that process.  *See* below at p. 13-15. Similarly, after receiving copies of Mr. McDaniel's report the government did not request to interview Mr. Nguyen. Counsel has complete respect for the Court and understands that credibility is within its purview. However, to the extent credibility is based on information gained from Mr. Nguyen, it would appear to impact reliability or weight of the evidence but would not go to Mr. McDaniel's credibility.

The defense submits that the analysis in this case should appropriately start with the process and methodology used by Agent Hamor, given the government's burden of proof, and then proceed to analysis of comparable information relied on by Mr. McDaniel.

### I.     The Government has the Burden of Proof at a Sentencing Hearing

The government bears the burden of proof at a sentencing hearing. The government must prove sentencing factors by a preponderance of the evidence. *See United States v. Valdez,* 225 F.3d 1137, 1143 n.2 (10th Cir. 2000). In this case, the government must prove that the amount of tax loss. It is not the Defendant's burden to disprove the government's amount of tax loss.

In this case Agent Hamor's testimony was based on his own construction of the applicable standards, without a basis in the process legally applicable.  In this sense, the government's proof depends on the "ipse dixit" of Agent Hamor.

In general, expert testimony is reviewed under certain standards.  Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

While the Rules of Evidence do not apply, this circumstance is very similar to those situations in which courts decline to consider opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *See Koch v. Koch Indus., Inc.,* 2 F.Supp.2d 1385, 1407 (D.Kan. 1998). The term "*ipse dixit*" is Latin, meaning, "he himself said it." BLACK'S LAW DICTIONARY 828 (6th ed. 1990). It is a "bare assertion resting on the authority of an individual." *Id.* An expert who relies solely upon the authority of his own statement to support his opinion is, in essence, asking the court to admit his expert opinion simply because he said so.

That is exactly what Agent Hamor is asking the Court to do here. His methodology reduces to the proposition that "I know what I'm looking at". For the reasons laid out below, Agent Hamor's testimony confirmed what was apparent from his analysis tables – his factual findings are based on nothing more than his subjective say-so.

### A. The Government failed to follow applicable standards in applying the bank deposits method

The classic bank deposits case is *Gleckman v. United States*, 80 F.2d 394 (8th Cir. 1935). The court held that standing alone bank deposits and large items of receipts do not prove additional tax due. On the other hand, if it is shown that these amounts can be associated with a business or income-producing activity, then the income is taxable.

The Internal Revenue Manual says that to be use the bank deposits method it must be shown that:

5

1. The subject was engaged in an income-producing business, activity or profession (Clearly Mr. Nguyen was in that he was selling scooters);

2. The subject made periodic deposits of funds to his account (Mr. Nguyen did);

3. That deposits reflect current year income and adequate investigation of deposits was made by the investigating special agent to negate the possibility that deposits arose from non-taxable sources (This was not done in this case); and

4. Unidentified deposits have an inherent appearance of income (that certainly isn't true as the large, round-dollar amounts do not have that appearance for a business that sells scooters; the government had no evidence other than the agent's opinion about what they were).

I.R.M., 4.10.4.6.4.1, Case Law (Banks Deposits and Cash Expenditures Method), available at http://www.irs.gov/irm/part4/irm_04-010-004-cont01.html#d0e3451, last visited September 29, 2014. The Manual goes on to state:

> An item of deposit may be unusual due to the kind of deposit, check or cash, in its relationship to the taxpayer's business or source of income. An explanation may be required if a large cash deposit is made by a taxpayer whose deposits normally consist of checks. Also, a bank statement noting only one or two large even dollar deposits, in lieu of the normal odd dollar and cents deposits, would be unusual and require an explanation.

I.R.M., 4.10.4.6.4.5, "Factors to Consider" http://www.irs.gov/irm/part4/irm_04-010-004-cont01.html#d0e3451, last visited September 28, 2014.

In *U.S. v. Boulware,* 384 F.3d 794, 810 (9th Cir. 2004), the Ninth Circuit stated:

> [t]he critical question [in examining the bank deposit method] is whether the government's investigation has provided sufficient evidence to support an inference that an unexplained excess in bank deposits is attributable to taxable income.

The government's investigative obligation in response to taxpayer "leads" as to sources of non-taxable income has been defined in *Holland v. United States*, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954). *Holland* held that to avoid injustice to the taxpayer, the government must investigate the relevant leads furnished by the taxpayer, that is, those which are "reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." *Id*, 348 U.S. at 136.

Here, Agent Hamor knew who two $50,000 checks were made out to and did talk to one of the sisters in law who received one of the $50,000 checks. She told him it was repayment of a loan. *Hamor Testimony,* Trans. p. 32; PSR, Doc. 27, pp. 8-9. Yet, this information was discredited because the income tax returns of the recipients of the checks did not reflect that they had the ability to make loans of this size. *Hamor Testimony*, Trans., p. 69. In fact, Agent Hamor merely looked at others' returns for several items that were actually loan repayments. *Id.* ("Based on tax returns and income that they reported on their tax returns not being able to support making that sort of loan . . . Just based on the limited amount of income that they reported each year.")

There are numerous reasons why a person could have funds available to loan that would not be apparent on their tax returns. Agent Hamer did nothing further to follow this lead. He merely continued to run with his previously conceived idea. "When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true". *Holland,* 348 U.S. at 136. Even if the income should have been apparent on the others' tax returns, Mr. Nguyen should not be held accountable for tax loss that others did not correctly claim.

Following the lead that these were loan repayments and correctly classifying them as such was important because it would show that there was cash on hand when NDP incorporated and cash available to purchase inventory prior to NDP's incorporation. Specifically correctly

7

classifying the loans: (1) helps determine what the true cost of goods sold was; (2) places the cost of goods in the proper tax period; and (3) correctly classifies the repayments of the loans. The Government got the second part of classifying the loans right; that is it did not allow the repayment of the loans as business expenses. However, the government failed to check on when the loans were made and what was done with the proceeds of the loans. The income should have been reduced or the expenses increased when the loans were received, but the government did neither.

Agent Hamor did limited investigation into what several large withdrawals were which he counted as income. Many of the large withdrawals were checks to Mr. Nguyen's wife, Lisa Greenwood. However Agent Hamor could not remember if during his interview of Ms. Greenwood he even asked her what the money was for. *Hamor Testimony*, Trans., p. 30. Although Defendant does not dispute that the checks and transfers to Central Marketing were personal, Agent Hamor's failure to ask Ms. Greenwood what the money was for is yet another indicator that Agent Hamor already had his own answer in mind, and, thus, did not see the need to investigate what the money was for.

Furthermore, Agent Hamor relied heavily upon Mark Shipley for how he conducted his tax loss analysis. The government relied on Mr. Shipley to find out how the business operated; who was responsible for bookkeeping; recordkeeping for the business; who was responsible to prepare the tax returns; what type of information they used to prepare the tax returns; who made the decisions for the business; how everything got set up; how the bank accounts were established; how the credit cards were established. *See Hamor Testimony, Trans., pp. 6-7.*

Defendant objected in the PSR to the inclusion of Mr. Shipley's interview as unreliable and again in his submission to the Court. *See* PSR, Doc. 27, p. 24; Defendant's Sentencing Memorandum, Doc. 30, pp. 10-11. The Government's entire analysis hinges on this unreliable

8

source. Mr. Shipley gave contradictory statements to the government agent and Defendant's expert as to whether online stores and in-store sales were to be separate. See Hamor Testimony, Trans., p. 65; Testimony of Mr. McDaniel, Trans., p. 89. Agent Hamor's entire theory of loss hinges is infected by Mr. Shipley's unreliable testimony.

It is not the defendant's burden to disprove the government's amount of loss, rather it is the government's burden to prove the amount of loss. *See Valdez*, 225 F.3d 1137. Basing its analysis on this unreliable source does not meet even the preponderance of evidence standard.

### B. The Government failed to account for non-taxable receipts and the disposition of such funds.

By discounting interviews that indicated expenditures were repayments of loans, the government failed to follow reasonable leads as required in a bank deposits computation. *See Holland supra.* Because leads were not followed, the government did not determine the existence and timing of non-taxable loan receipts, ascertain what disposition was made of such receipts, nor establish how much cash was on hand at relevant points, including when NDP was incorporated.

The evidence, as detailed below, reflects that this was a cash intensive business.

The Internal Revenue Manual says that "cash intensive businesses where significant amounts of gross receipts are not deposited and numerous cash outlays occur, do not lend themselves to this method." IRS Audit Manual § 4.10.4.6.4.2, found at http://www.irs.gov/irm/part4/irm_04-010-004-cont01.html#d0e3451, last visited September 29, 2014. Here, there were numerous cash outlays.

The government took the view there was not any cash on hand when National Direct Powersports was incorporated in October 2005. There is evidence that cash was used substantially in the business beyond Mr. Nguyen's word, yet the Government did not account for cash on hand

in its analysis nor consider the possibility of cash business expenses that would not be reflected in the analysis of bank accounts. *See Hamor Testimony*, Trans. p. 56.

### 1. Mr. Shipley's bank account

Agent Hamor testified that he did not "allow the cash as business expenses because Mark Shipley said there was no business expenses that were being paid with cash". *Hamor Testimony,* Trans., p. 39. Initially Defendant would assert the same objection that this is based on Mr. Shipley's unreliable statement.

Furthermore, Mr. Shipley's bank accounts reflect the actions of one who deals primarily in cash. *See* Sentencing Hearing, Exhibit 9; Testimony of Dale McDaniel, Trans., pp. 118-119. Nearly every deposit into Mr. Shipley's account is cash which indicates he was paid in cash and negates Agent's Hamor assertion that no business expenses were paid in cash. *Id*. at p. 119.

The bank account records reflect Mr. Shipley only deposited enough cash to cover set expenses, such as rent and his credit card payment. *Id.* The statements reflect that very little was paid for through credit or his bank, thus, indicating he lived primarily on cash and was paid in cash from the business. *Id.* The evidence supports a finding that Mr. Shipley did not "make cash large deposits in his bank accounts of hundreds of thousands of dollars"[1] or "make cash withdrawals of hundreds of thousands of dollars to give to his relatives"[2] simply because he never deposited the cash that he earned from NDP into his account. His bank statements do not support a finding that he "did not get anything from the corporation,"[3] rather they support that he got cash from the corporation.

### 2. The numbers themselves

---

[1] Trans. p. 43-44
[2] Id.
[3] *Id.*

10

The numbers as posited by the government simply do not pass the smell test. According to the Government the net profit for NDP in 2005 was $74,515.50 [4] and was $1,206,131.97 in 2006. [5] Thus, according to the government's analysis, NDP's profit margin went from 6 percent in 2005 to 36 percent in 2006. *See Hamor Testimony,* Trans., p. 47.

Agent Hamor explained this increase away because NDP did not increase advertising expenses as the number of good sold increased. *See* id. However, this does not take into account the fact that the cost of goods should have increased incrementally with the amount of goods sold. According to the government's calculations it did not. Agent Hamor did not do any analysis as to why there was such a disproportionate profit margin. *Id.*

Mr. Nguyen's expert, Dale McDaniel, has substantial experience in accounting. *See* Doc. 30, Ex. 6, McDaniel Resume. In his experience and training, profit margins generally do not increase this much in one year. *McDaniel Testimony,* Trans., p. 119-120. Such a large increase indicates an error in calculation. *Id.*

There simply is no way the amount of revenue could increase the amount that it did without a corresponding increase in cost of goods.  Because the cost of goods did not increase proportionally as reflected in the bank accounts, it indicates NDP was paying the suppliers in cash. Despite this disproportionate growth in profit margin, the government never attempted to interview any of the suppliers.

> **C. The largest distinguishing factor between the government's analysis and the defendant's analysis is that Mr. McDaniel took into account the S corporation status.**

---

[4] *Testimony of Agent Hamor,* pp. 46-47, Exhibit 14.
[5] Id.

Mr. Nguyen's testimony is not needed to see that National Direct Powersports changed the way it operated and intended to conduct business as an S corporation in October 2010.

As detailed above Mr. Nguyen disputes that the government met its standard of proof to show that several of the classifications of individual items: Specifically the neglecting to count two checks for $50,000 that were paid to Mr. Nguyen's sisters in law, the $10,000 to Tran Nguyen, the $80,000 to Nguyen Nguyen Auto as loan repayments. As detailed above, classifying these items as loan repayments is important because it reflects that there were loans in cash made. These repayments of loans are the leads that the government should have followed to get an accurate analysis. Mr. Nguyen also disputes the government classifying the $172,000 in cash withdrawals as income. Sentencing Hearing Ex. 12.

Agent Hamor and Mr. McDaniel's analysis of the credit cards were substantially the same. *Testimony of Agent Hamor*, Trans., p. 38.

However, the classification that makes the largest difference in the amount of tax due and owing is the classification of the business as an S corporation. Agent Hamor agreed that if one used an S corporation analysis, it would result in lower taxes. *See* Trans. p. 50.

That Mr. Nguyen and Mr. Shipley intended to run NDP as an S corporation is evident from the documents as submitted at the hearing and discussed in Defendant's Sentencing Memorandum. *See* Sentencing Memorandum, Doc. 30, pp. 4-6; Exhibits 1,2, 4, 7A, 7B, and 7C. Thus the more accurate analysis is Defendant's which takes into account the S corporation.

## II. Defendant's amount of tax loss due and owing is the more accurate number, however, a tax loss of up to $200,000 results in the same sentencing guideline.

Under U.S.S.G. § 2T1.1(a), the offense level for filing false tax returns is either the level from the tax table ( § 2T4.1) corresponding to the tax loss, or level 6 if there is no tax loss.

As detailed in prior filings and at the sentencing hearing, Defendant believes the appropriate amount of tax due and owing is $88,831. The government believes that correct amount is $436,796 for 2006. The table for tax loss, which is the determinative factor in a tax evasion case, states that when there is a tax loss greater than $80,000 and less than $200,000 the base level offense is a level 16.

Where the tax loss is uncertain, the court shall "make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1, comment (n.1). Defendant posits that his finding is the more reasonable estimate based upon all of the facts. However if the Court found a reasonable estimate of tax loss of up to $200,000, it would still fall in the same offense level.

Estimates of tax loss that span a sentencing range have been held appropriate. *See United States v. Weakley*, 175 Fed. Appx. 847, Fn. 1, 851,2006 U.S. App. LEXIS 8720, 7,97 A.F.T.R.2d (RIA) 1830(9th Cir. Or.2006)("At the initial sentencing hearing, the district court found a tax loss of between five and ten million dollars, and we affirmed that tax loss finding on appeal.")

### III.   Defendant spoke to the probation office and was not asked about the offense.

The Court said at sentencing that Mr. Nguyen refused to speak to the probation office. Mr. Nguyen fully cooperated with the probation office in its pre-sentencing investigation.

Mr. Nguyen answered all questions asked of him at an interview in the probation office. Probation officer Roy Day visited Mr. Nguyen at home and spoke with him on the phone several times. *See* Presentence Investigation Report, Doc. 27, pp. 12-15.

It is not standard practice for the probation office to discuss the facts of the case with a defendant during a presentence investigation. According to an instructive manual put out by the Office of Probation and Pretrial Services, the areas to be inquired about during the Presentence Interview are:

13

- Personal History and Characteristics
- Physical Condition
- Mental and Emotional Health
- Substance Abuse
- Educational, Vocational, and Special Skills
- Employment
- Financial Condition: Ability to Pay
- Urinalaysis
- Home Investigation and Collateral Contracts

Publication 107, The Presentence Investigation Report, Office of Probation and Pretrial Services, Administrative Office of the United States Courts (Rev. March 2006), available at http://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Horvath_presentence.pdf, last visited Sept. 29, 2014.

Mr. Nguyen answered all of these inquiries in full cooperation with the Probation Office even noting that his siblings were likely a year older than reflected on their birth certificates. *See* Presentence Investigation Report, Doc. 27, pp. 12-14.

In the same manual under "Investigating the Instant Offense," probation officers are directed to interview the Assistant United States Attorney and Defense Counsel, not the Defendant. *See* id.

Defense Counsel spoke with the probation officer and arranged for the officer to speak with Mr. McDaniel. The Presentence Investigative Report reflects that the "analysis was conducted without the benefit of explanations from the defendant, who exercised his right not to discuss his involvement in the instant offense without the assistance of counsel." PSR, Doc. 27, p. 24. Mr. Nguyen was not asked about the offense, thus, neglecting to speak to the probation office about his offense should not be held against him.

**IV.     For the reasons set out in Defendant's Sentencing Memorandum, a sentence of probation is the appropriate sentence.**

Regardless of the amount of tax due and owing the Court finds, a sentence of probation would be appropriate. A sentence of probation would allow Mr. Nguyen to earn income and begin repayment of the tax due and owing much quicker than if he were sentenced to prison.

The prior arguments as laid out in Defendant's Sentencing Memorandum for why probation is an appropriate sentence are incorporated by reference herein. *See* Defendant's Sentencing Memorandum, Doc. 30.

## CONCLUSION

The appropriate sentence in this case is a sentence of probation for several reasons, including the fact that Mr. Nguyen was a 23-year-old without a college degree when the crime was committed, the government's amount of loss is incorrect and substantially over inflated, Mr. Nguyen has been punished sufficiently by having to forgo his future plans, and he best will be able to pay restitution if he is gainfully employed and not imprisoned.

Respectfully submitted this 30th day of September, 2014.

**THOMPSON LAW FIRM, LLC**
106 E. 2nd Street
Wichita, Kansas  67202
Telephone:     (316) 267-3933
Fax:             (316) 267-3901
E-mail:lthompson@tslawfirm.com


  **s/ Lee Thompson**
Lee Thompson (#08361)
Erin Thompson (#22117)

15

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 30th day of September, 2014, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the appropriate parties.

                              __**s/ Erin Thompson**_____