IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,    )
                      )
           Plaintiff,   )   **CRIMINAL ACTION**
                      )
v.                  )   No. 12-10219-MLB
                      )
DINH NGUYEN,           )
                      )
           Defendant.   )
_____)

<u>MEMORANDUM AND ORDER ON OBJECTIONS</u>

**I.   Introduction**

     Defendant has entered a guilty plea to count 2 of an indictment charging tax evasion in violation of 26 U.S.C. § 7201. The factual basis for his plea, as set forth in the plea agreement, is as follows:

> The defendant, Dinh Nguyen, owed substantial income tax in addition to the tax liability he reported on his 2006 U.S. Individual Income Tax Return, Form 1040. In June 2007, when the defendant signed, a U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service on June 21, 2007, he knew that the tax return was false and, thus intended to evade or escape payment of a substantial amount of income tax due and owing in excess of the amount of $0.00 which Mr. Nguyen stated was income tax due and owing for the calendar year 2006.
>
> The parties understand that the court will determine the amount of this substantial tax loss/tax owed at sentencing for purposes of guideline calculations under the advisory sentencing guidelines.

(Doc. 24).

     A presentence report was prepared. (Doc. 27). Paragraphs 13-23 of the PSR summarize the offense conduct, which includes a description of how defendant and his business partner, Mark Shipley, operated

their scooter businesses.  The tax loss calculations contained in the PSR were determined by IRS Agent Aaron Hamor.  Defendant objected to almost the entire offense conduct section with the exception of ¶¶ 20 and 22.  He objected to all paragraphs pertaining to calculation of tax loss and offense level calculation, ¶¶ 23-25, 29-36, 40-49 (except acceptance credit) and criminal history, ¶ 53.  In other words, defendant objected to virtually every paragraph of the PSR which has a negative impact on his guideline sentence.  (Doc. 27 at 22-23).

The court held an evidentiary hearing on August 5, 2014.  The government's expert, Aaron Hamor, testified as to his opinion of the tax loss.  Defendant put forth his version of the offense conduct, as well as the support for almost all of his objections, entirely through the written report and testimony of his expert witness, a former IRS agent named R. Dale McDaniel.

In addition to the testimony and evidence introduced at the hearing, both parties have filed sentencing memoranda.  (Docs. 30, 31, 39, 40, 41).  The court is now prepared to determine the amount of loss as a result of defendant's tax evasion.  The court will rule on the objections which impact the guideline sentence.  Objections not specifically ruled on may be considered as having no impact on the sentence.

## II. Analysis

Under the Guidelines, the court must determine defendant's base offense level by calculating the tax loss and comparing it to the tax loss table in U.S.S.G. § 2T4.1.  See U.S.S.G. § 2T1.1(a)(1); United States v. Thompson, 518 F.3d 832, 867 (10th Cir. 2008).  "For an offense involving tax evasion, the tax loss is the total amount of

loss that was the object of the offense ( i.e., the loss that would have resulted had the offense been successfully completed)." Thompson, 518 F.3d at 867.

In this case, both Hamor and McDaniel utilized the bank records method to determine the amount of loss. However, their amounts are drastically different. Hamor concluded that defendant's conduct resulted in a tax loss of $459,284 for the years 2005 and 2006. McDaniel concluded that the loss during those same years was $88,831. Because defendant's objections to the PSR and Hamor's calculations rely on McDaniel's testimony and report, the court will first turn to McDaniel's testimony and opinions.

**A.    The Basis for McDaniel's Opinions and the Corresponding Objections**

McDaniel, who testified that he felt "a little bit sorry" for defendant and was "concerned about his future . . .." (Doc. 38 at 81), interviewed defendant at length as well as defendant's former business partner, Mark Shipley. McDaniel and an unidentified "associate" he described as a "retired FBI agent" obtained a written statement from Shipley which was alluded to on page 10 of McDaniel's written report (but not attached as an exhibit) but which was produced by defendant at the August 5, 2014 hearing (Exhibit 4). McDaniel and his "associate" did not obtain a written statement from defendant, an interesting and, in my view, significant and unexplained contrast, particularly in view of McDaniel's testimony that he handled defendant's interview ". . . a lot like I would have handled a meeting with the subject of an investigation back in my old days when I was an agent." (Doc. 38 at 86). In his post-sentencing memorandum,

defendant makes the rather extraordinary statement that: " . . . to the extent credibility is based on information gained from Mr. Nguyen, it would appear to impact on weight of evidence but would not go to Mr. McDaniel's credibility." (Doc. 39 at 4). I strongly disagree. Defendant may have a right to refuse to speak with IRS agents, the probation officer and me about his version of the offense. But when he elects to use a former IRS agent to tell his story to me, and the former IRS agent seeks to bolster his credibility with me by invoking his investigative methods as a former IRS agent, then his failure to take a written statement from defendant bears directly on McDaniel's credibility, as well as his bias, methodology and the accuracy of his opinions. Fed. R. Evid. 702. More on this later.

During the presentence investigation phase of the case, defendant objected to inclusion in the PSR of references to summaries of Shipley's interview on the basis that they are hearsay and because they conflict with statements Shipley gave to defense counsel and McDaniel. (Doc. 41 ¶ 15). The probation officer excluded the statements from the PSR (Doc. 27 ¶ 133). The hearsay rules do not apply at sentencing. Fed. R. Evid. 1101(d)(3). Defendant acknowledges this in his post-sentence memorandum (Doc. 39 at 5) and then proceeds for several pages to refer to Shipley's statement to support his argument that Shipley is an unreliable witness. It is inconsistent to object to Shipley's statement in the PSR as inadmissible hearsay but then refer to its allegedly unreliable contents in a post-sentence memo. And, of course, if the hearsay rules _did_ apply at sentencing, then wouldn't defendant's statements to McDaniel also be hearsay? I

think so.[1]  Moreover, the fact that statements are said to conflict is not a valid objection to their inclusion.  18 U.S.C. § 3661.  The better practice would have been to include the statements and let me decide whether they conflict and, if so, whether the conflict is material.

I'll now turn to the objections.  PSR ¶ 14 says that defendant incorporated BN Scooters in February 2004.  Defendant was president and treasurer; Shipley was secretary.  Notwithstanding incorporation, defendant and Shipley treated the business as proprietorships and both continued to report income on Schedule C of their 2004 Forms 1040.  Defendant reported income from the on-line business.  No corporate return was filed.  Defendant objects that scooter sales were ". . . never divided by in-store and on-line sales."  This statement is unsupported and the objection is therefore overruled.

PSR ¶¶ 15-19 state that during 2005, BN Scooters began conducting business as National Direct Powersports d.b.a. Scooter World (NDP).  Articles of incorporation for NDP were filed by defendant's brother in October 2005.  Defendant and Shipley were the officers.  NDP's tax return listed defendant with 10% stock ownership and Shipley with 90%.  On his 2005 and 2006 Forms 1040, schedule E, defendant reported 10%

---

[1]  Defendant makes another extraordinary statement: "Similarly, after receiving copies of Mr. McDaniel's report, the government did not seek to interview Mr. Nguyen."  (Doc. 39 at 4).  Defendant does not say that had the request been made, he would have agreed to an interview.  Moreover, except perhaps in the situation where a defendant is seeking §5k1 or Rule 35 consideration by providing information against others (clearly not the case here), I've never heard a defendant claim that some sort of negative inference should be drawn against the government because it did not request to interview him or her after the PSR had been prepared and the case was ready for sentencing.  This is particularly so when, as here, the defendant previously had refused to be interviewed.

of NDP's income.  During 2004-2006, defendant maintained accounts at Bank of America ending in 3836 and 8729.  The 3836 account was in defendant's name d.b.a. BN Scooters.  The 5729 account was in the name of Scooter World but in October 2005, the name was changed to National Direct Powersports, DBA Scooter World.  Deposits in the 3836 account totalled $1,483,672.28 for 2005 and $725,603.45 for 2006.  Deposits in the 5729 account for 2005 totalled $37,656.64 for 2005 and $2,663,735.08 for 2006.  Defendant does not object to this information.  Defendant does object to the IRS's determination that the accounts were personal, not corporate.  He asserts that the S corporation status should be taken into account when determining his income and taxes owing, citing pages 5-7 of McDaniel's report.

Pages 5-8 of McDaniel's report pertain to "Gross Bank Deposits." McDaniel states that to "correctly calculate Nguyen's income for 2005 and 2006 [the year of conviction] the existence of NDP has to be recognized, and income attributable to that corporation has to be calculated separately to determine Nguyen's personal income ". . . because . . . Nguyen changed his method of doing business significantly in October 2005 when NDP was incorporated."  McDaniel identifies three additional Bank of America accounts (numbers ending in 0311, 0067 and 2267) as well as a $30,000 CD purchased and redeemed in 2005.  He denominates each account as defendant's "personal accounts," the apparent implication being that the IRS misunderstood and misapplied the transactions in the 3586 and 5729 accounts in determining defendant's liability for personal income taxes.

McDaniel ultimately concludes that defendant owed no tax for 2005 and that his "corrected income tax due for 2006 was $88,831."  It is

readily apparent from pages 8-13 of McDaniel's report that McDaniel reached this conclusion from information provided during defendant's unrecorded interview. For example, in the section entitled Business Expenses Paid with Personal Loans, McDaniel relied on information provided by defendant: "payments . . . identified by Nguyen"; "Nguyen stated that the proceeds. . ."; "Nguyen reviewed . . . and identified . . . personal loans deposited . . ." Based on the information provided by defendant, McDaniel concluded that in 2005, $110,700 constituted undeposited personal loans used for business expenditures paid in cash.

In the section labeled Proprietorship Income Deposited to NDP Account, McDaniel states: "Nguyen identified how deposits to account 3836 . . ."; ". . . these deposits were treated as capital contributions by Nguyen."

In the section entitled Ending Inventory 10/9/05, McDaniel begins his analyses with "During an interview with Nguyen during this engagement, he stated . . ."[2] Then, in discussing Long Term Capital Gain or NDP Distribution, McDaniel observes "During 2005 and 2006, Nguyen made numerous capital contribution to NDP . . ." citing to Schedule A-5 of his report. (McDaniel explained that the second page of Schedule A-4 should be A-5. (Doc. 38 at 106.)) This information had to come from defendant because no independent source is cited.

At the August hearing, McDaniel continued to base his testimony on information gained during defendant's interview. For example, McDaniel testified that when NDP was incorporated in 2005, there was

_____

[2]See also Doc. 38 at 107-08.

an infusion of capital of ". . . about $100,000, I believe, that went into the corporate bank account either from Mr. Nguyen's personal funds or[3] from borrowed funds" followed by another approximately $200,000 in November. (Doc. 38 at 93). Then, after volunteering that in the IRS, ". . . you have the burden to follow every reasonable lead. . ." (Doc. 38 at 100), McDaniel acknowledged that he relied on defendant's word regarding the loans coming from family members. (Doc. 38 at 125). McDaniel admitted that there was no documentation of the loans or the repayments because "It was in cash." (Doc. 38 at 127 and 131-32). When IRS Agent Namir tried to interview defendant's brothers about the loans, he wasn't allowed to do so. (Doc. 38 at 69). McDaniel's "explanation" of lack of documentation was his alleged experience with ". . . the Asian culture. . ." (Doc. 38 at 82). It seems reasonable that if McDaniel was, to use his words, following "every lead," he would have interviewed the family members who supposedly made loans to, and were repaid by, defendant. He didn't. Instead, he took defendant's word. (Doc. 38 at 125-26 and 131-32).

McDaniel also testified that he learned from defendant that, at times, he paid suppliers by hand-delivering cash to them in either California or Las Vegas. (Doc. 38 at 109 and 117). McDaniel "confirmed" defendant's statements by the following method: "I spot checked some credit card records to see if there were airplane fares purchased that would correspond to cash withdrawals; and I did find that to be present. So there was some confirmation that the story I

---

[3]"Or"? McDaniel made no investigation to determine the source. See also Doc. 38 at 102-03.

heard was a true one." (Doc. 38 at 104-05). There is nothing to indicate that McDaniel spoke with any of the suppliers in order to run down "every lead."

Based on McDaniel's report and his testimony at the hearing, I find that McDaniel's methodology is suspect and that the conclusions are biased – in other words, that McDaniel was determined to reach a result and, using information unavailable to the IRS, selectively relied upon information which he manipulated to reach that result. For these reasons, I have disregarded McDaniel's conclusions. Defendant's objections which are based on McDaniel's analysis are overruled.

**B.    Testimony and Opinion of Agent Hamor**

To support the amount of loss set forth in the PSR, the government offered the testimony of IRS Agent Hamor. In determining the amount of loss, Hamor reconstructed the profits and expenses by reviewing defendant's bank accounts, credit card statements and interviews with various individuals.[4] The majority of the income for NDP was figured by reviewing the credit card payments to the bank accounts. Hamor also included some cash deposits as income.[5] Hamor then reviewed the bank accounts and credit card statements for potential business expenses. Hamor then deducted those as business

---

[4] As stated previously, defendant declined to be interviewed by Hamor. (See Govt. exh. 14 at 2).

[5] Defendant disputes "the government classifying the $172,000 in cash withdrawals as income," citing Hearing exhibit 12. (Doc. 39 at 12). The government's exhibit 12, however, does not list the $172,000 cash withdrawal. Agent Hamor testified that he did not allow the $172,000 in cash withdrawals to be classified as business expenses. (Tr. at 39). Hamor did not state that he classified the withdrawals as income.

expenses.  Hamor, however, did not deduct cash withdrawals as business expenses based on Shipley's statement that the business did not pay expenses in cash.  Hamor also attempted to determine if there was a legitimate business expense for large checks made to individuals. Hamor did not allow the checks to be deducted as business expenses if he could not determine its purpose.

Defendant objects to Hamor's methodology and amount of loss because 1) Hamor failed to determine whether certain payments were repayments of loans; 2) the numbers do not pass the "smell test"; and 3) Hamor disregarded the S corporation status of NDP.

**1.   Loan Repayments**

Defendant argues that payments to Lisa Greenwood, his brothers and sisters-in-law were in fact loan repayments and Hamor failed to identify those payments as such.  Defendant contends that the incorrect classification increased the amount of tax loss because those "loans" would have resulted in defendant's income being reduced or expenses being increased at the time the loan was made.[6]  (Doc. 39 at 8).  This argument is interesting, especially in light of the fact that defendant's own expert did not follow the "leads" or determine when or why the "loans" were made in the first place.

In support of defendant's argument, he cites to <u>Holland v. United States</u>, 348 U.S. 121 (1954) for the proposition that the government must investigate the relevant leads furnished by the <u>taxpayer</u>. (Emphasis supplied).  In <u>Holland</u>, the Supreme Court was not faced with

---

[6] Defendant does not object to Hamor's disallowance of the "loan" payments to various individuals as a business expense.  (Doc. 39 at 8).

a determination of tax loss for sentencing purposes; rather, the court reviewed a tax evasion conviction based on the net worth method of determining taxable income. In that case, the court stated that a failure to investigate leads furnished by the taxpayer may result in injustice but determined that the agents had done a thorough investigation and there was sufficient evidence to uphold the conviction. In this case, Hamor was not told by anyone that the payments to Lisa Greenwood or Central Marketing were repayments of loans. Therefore, there were no "leads" to follow in determining the purpose for those payments. See United States v. Breger, 616 F.2d 634, 635 (2nd Cir. 1980)("The argument that the Government did not investigate the repayments under the 'leads' doctrine, see Holland v. United States, [] is without substance. . . [defendant] had not advised the Government of the supposed cash receipts, his close friend had not done so when interviewed, and their joint attorney never produced the supposed documentation stock purchase orders underlying the 'loan' and 'repayment.' In other words there were not 'leads' to follow, only afterthoughts.")

With respect to the $50,000 payments made to the sisters-in law, Hamor was told that those payments were repayments of a loan. Hamor determined that they were not loans because there was no documentation to support that conclusion. The court agrees with Hamor. A statement that a check was a repayment of a loan without any documentation or information as to the purpose of the loan or when it was made is not sufficient to support a deduction. See id. (testimony that cash payments were "repayments was totally unsubstantiated by any documentation such as books, records, notes, receipts, or the like.");

-11-

see also United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999) (although defendant may deduct "legitimate but unclaimed deductions," . . . "We do not interpret this provision as giving taxpayers a second opportunity to claim deductions after having been convicted of tax fraud.") "It must be remembered that, in tax loss calculations under the sentencing guidelines, we are not computing an individual's tax liability as is done in a traditional audit. Rather, we are merely assessing the tax loss resulting from the manner in which the defendant chose to complete his income tax returns." Id.

Defendant also contends that checks to defendant's brothers were loan repayments. Hamor testified that defendant's brothers refused to be interviewed. Therefore, he had no evidence that those payments were repayments of "loans." Moreover, again, there was no paperwork to support a finding that the payments were loan repayments.

Therefore, defendant's objections concerning the failure to treat cash payments are overruled.

## 2.   Numbers do not Pass the "Smell Test"

Next, defendant argues that such a large increase in revenue is suspect and indicates an error in calculation. Defendant asserts that a large profit margin should correspond with an increase in the cost of goods. Defendant, however, does not identify any expenses which were not allowed. The evidence concerning defendant's business was that the only product owned by NDP was the scooters on display in the brick and mortar store. When a customer purchased a scooter online, the scooter was shipped from the manufacturer and a payment would be made to one of the bank accounts. The manufacturer would then be paid by check or debit from one of the bank accounts. Therefore, there is

-12-

no support in the record for defendant's contention that the government has failed to deduct the cost of goods.

### 3.   S Corporation Status

Finally, defendant objects to Hamor's decision to disregard NDP's S Corporation status and treat all income as Schedule C income. Hamor testified that he disregarded the S corporation status because defendant's distributions were not consistent with his election as a 10% shareholder and prior to the S corporation election defendant had filed his taxes claiming the income on Schedule C. (Tr. at 48-50).

Defendant contends that Hamor should have treated NDP as an S Corporation because that is how defendant and McDaniel classified NDP. Defendant offers no authority to support his position[7] nor does he dispute the IRS' ability to change the tax treatment of the filer. Moreover, there is no dispute that NDP, as formed by defendant and Shipley, never distributed the profits in a 90/10 split. There is also no dispute that defendant filed an amended election to reflect the true ownership of NDP.

Therefore, the court finds that Hamor correctly characterized the income on Schedule C.

## III. Conclusion

The court finds that defendant's conduct resulted in a tax loss of $459,284 for the years 2005 and 2006. Defendant's objections to specific paragraphs of the PSR set forth in objection No. 2 are overruled.

Defendant's objection No. 1, to the maximum fine, is sustained.

---

[7] As stated <u>supra</u>, the court does not find McDaniel's opinions reliable.

The sentencing hearing will be held on December 8, 2014, at 10:30 a.m.

IT IS SO ORDERED.

Dated this ___7th___ day of November 2014, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE